OPINION
Defendant-appellant Loy Grimes appeals his conviction and sentence from the Guernsey County Court of Common Pleas on one count of murder in violation of R.C. 2903.02 with a firearm specification. Plaintiff-appellee is the State of Ohio.
 STATEMENT OF THE FACTS AND CASE
On June 30, 1997, the Grand Jury of the Guernsey County Court of Common Pleas indicted appellant on one count of aggravated murder in violation of R.C. 2903.01 and one count of murder in violation of R.C. 2903.02. Both of the counts were accompanied by a firearm specification. At his arraignment on July 15, 1997, appellant entered a plea of not guilty to the charges contained in the indictment. Thereafter, a five day jury trial commenced on January 12, 1998. The following evidence was adduced at trial. Appellant Loy Grimes and Sandy Moore had been dating for approximately five years when, in April of 1997, the two ended their relationship. After the break up, appellant moved to West Virginia to live with his mother. Prior to the couple's breakup, appellant had helped Moore purchase a car for $1,500.00. Moore had possession of the vehicle, but the vehicle was titled in appellant's name. At trial, Moore testified that appellant called her at work in May of 1997 and told her that he wanted repaid for the money that he had given her for the car. Moore further testified that appellant told her that he would burn the car if she did not repay him the money. Appellant, in turn, testified that he called Moore because he wanted his name removed from the vehicle's title since he was concerned that Moore, who had a prior DUI conviction and who did not have a valid driver's license, was driving under the influence of alcohol. On June 1, 1997, appellant drove from West Virginia to Cambridge, Ohio, with a loaded firearm on the seat of his truck. Appellant, who testified that he had purchased the gun for protection against bears, took the gun with him because he did not want his stepfather, who had symptoms of dementia, to get ahold of the same. Upon arriving in Cambridge, appellant went to the restaurant where Moore worked as a waitress. The two briefly discussed the car situation at that time. While appellant was at the restaurant, Moore told appellant that she was going to a benefit at the Eagles after work and that, after the benefit, she would meet appellant at the Deep Cut Tavern at 5:00 P.M. On her way to the Eagles benefit, Moore saw appellant's truck in the parking lot of the Deep Cut Tavern. She did not, however, stop at the tavern at that time. After Moore failed to appear at the Deep Cut Tavern, appellant went to the Eagles where he ran into Fred Duniver, a friend of Moore's, at approximately 7:00 P.M. Appellant, who Duniver testified was "raising cain" about a car and was "very angry" about the money Moore owed him for the car, asked Fred Duniver to take him into the Eagles since Fred Duniver was a member. Transcript of Proceedings at 229. After Fred Duniver refused to do so and told appellant that he "was acting like a dickhead", appellant got into his truck and drove back to the Deep Cut Tavern. Transcript of Proceedings at 232. Fred Duniver told Moore and her friends, including Fred Hylton, the victim in this case, of the incident involving appellant. While she was still at the Eagles, Moore received a phone call from appellant. Moore testified that appellant, who knew that Moore had been drinking, told Moore that "she better not drive the car up out of there because he would call the cops on me." Transcript of Proceedings at 347. Appellant also told Moore that she "shouldn't be messing with him." Transcript of Proceedings, at 347-348. Approximately an hour later, Moore received a second call at the Eagles from appellant. Since Moore was concerned with appellant's behavior, at Moore's request, Richard Duniver, another friend of Moore's, listened in on the call. Appellant, Moore testified, "told me again he said you don't know me. You don't know who you're messing with. I'm going to blow your head off and he said that like three times." Transcript of Proceedings at 351. Moore testified that appellant had never threatened to kill her before. Richard Duniver also testified that, during the call, appellant told Moore three times that he was going to kill her. According to Richard Duniver, during the telephone call appellant "was extremely upset with her [Moore]. Said that she had lied to him. Cheated him out of some money. Owed him money and that he was going to kill her." Transcript of Proceedings at 254. Since Richard Duniver was concerned with Moore's safety, he suggested that Moore call the police after the telephone call. Moore, however, declined to do so since she did not want to get appellant in trouble and did not believe that he would follow through with his threats. Both Moore and Richard Duniver did, however, tell the others seated at their table including Jackie Vandyne and Fred Hylton, of appellant's threats. Shortly after the second telephone call, Moore decided to leave the Eagles. Richard Duniver and Fred Hylton were going to escort Moore to her car. Thereafter, Moore and a group of her friends, including Fred Hylton, and Jackie VanDyne, exited the Eagles. When Moore saw appellant sitting in his truck in the Eagles' parking lot, Richard Duniver took Moore back inside the Eagles. Richard Duniver then went back outside and told Fred Hylton and Jackie VanDyne that he had taken Moore inside the Eagles because Moore was sick. When Richard Duniver told Fred Hylton and Jackie Van Dyne that appellant was in his truck in the parking lot, Hylton, who knew appellant, offered to talk to appellant. After Richard Duniver told Hylton that appellant was "very upset" and warned him against approaching appellant, Duniver then went back inside the Eagles with Jackie VanDyne. Transcript of Proceedings at 266. Upon exiting the Eagles shortly thereafter, Richard Duniver saw Hylton and appellant two parking spaces down from where he had observed appellant's truck parked. When he went over to where appellant and Hylton were located, Richard Duniver saw Hylton with his back to a dumpster and the back of his hands to his back. Appellant, who was facing Hylton, was talking with him. Richard Duniver testified that appellant "[i]n one motion . . . brought up his hand and hit Fred [Hylton] in the chest and at the same time he brought up the gun and he said you mother fucker and shot him." Transcript of Proceedings at 270. Hylton then crumpled to the ground. In contrast, appellant, however, testified at trial that Hylton was shot while the two were struggling with a gun. According to appellant, Hylton had approached appellant's truck, threatened him, and grabbed the truck's door handle while threatening appellant. Appellant testified that he grabbed his gun when Hylton yanked appellant from the truck. Hylton, according to appellant, was then shot trying to wrestle the gun out of appellant's hands. After shooting Hylton, appellant pointed the gun in Richard Duniver's direction. Richard Duniver then ran into the Eagles and called 9-1-1. After the shooting, appellant fled the scene and went over to a friend's house. Subsequently, appellant turned himself in to the Cambridge Police Department and was arrested. At the conclusion of the evidence, the jury retired and later returned with a verdict on January 16, 1998, finding appellant not guilty of aggravated murder but guilty of murder. The jury further found that appellant had a firearm on or about his person or under his control in violation of R.C. 2903.02 while committing the offense of murder. Thereafter, appellant was sentenced to an indefinite term of imprisonment of fifteen (15) years to life for the murder conviction plus an additional three years of actual incarceration for the firearm specification. The two sentences were to be served consecutively. Appellant was also fined $5,000.00. A judgment of conviction was filed on January 20, 1998. It is from his conviction and sentence that appellant prosecutes this appeal, raising the following assignments of error:
ASSIGNMENT OF ERROR I
 THE TRIAL COURT ERRED TO THE PREJUDICE OF DEFENDANT-APPELLANT BY ENTERING A JUDGMENT OF CONVICTION OF MURDER WITH A FIREARM SPECIFICATION WHERE SELF-DEFENSE WAS ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE AND CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
ASSIGNMENT OF ERROR II
 THE TRIAL COURT ERRED BY REFUSING TO USE THE JURY INSTRUCTION ON SELF-DEFENSE AS REQUESTED BY THE DEFENDANT.
ASSIGNMENT OF ERROR III
 THE EVIDENCE WAS INSUFFICIENT TO CONVICT DEFENDANT OF MURDER AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
 I, III
Appellant, in his first and third assignments of error, contends that his conviction for murder in violation of R.C. 2903.02 is against the manifest weight and the sufficiency of the evidence. Appellant specifically maintains that he established the affirmative defense of self defense by a preponderance of the evidence and that he did not act purposely in causing Hylton's death because he had no specific intent to take Hylton's life and, therefore, should not have been found guilty of murder. In State v. Jenks (1981), 61 Ohio St.3d 259, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the evidence is made. The Ohio Supreme Court held: An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jenks, supra, at paragraph two of the syllabus. On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine "whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed . . . The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction". State v. Thompkins (1997),78 Ohio St.3d 380, 387 citing State v. Martin (1983), 20 Ohio App.3d 172,175. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, syllabus 1. To establish self-defense, the following elements must be shown: (1) the slayer was not at fault in creating the situation giving rise to the affray; (2) the slayer has a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) the slayer must not have violated any duty to retreat or avoid the danger. State v. Palmer (1997), 80 Ohio St.3d 543, 563, citing State v. Robbins (1979), 58 Ohio St.2d 74. Appellant, in support of his argument that he established the defense of self defense by a preponderance of the evidence, alleges that Hylton, by approaching appellant while he was seated in his truck and threatening appellant, was the aggressor. According to appellant, Hylton jerked the door to appellant's truck open and tried to drag appellant from the same. Appellant further submits that, because of his high blood pressure and history of heart troubles and the fact that he was considerably older and lighter in weight than Hylton, he had an honest belief that he was in imminent danger of death or great bodily harm. However, upon review of the record, we find that appellant's conviction for murder was not against the manifest weight or the sufficiency of the evidence. Richard Duniver, the State's witness, testified that he saw Fred Hylton approximately two parking spaces down from where appellant's truck was parked with his back to a dumpster. Hylton, who trial witnesses testified was not an aggressive person, was standing with the "back of his hands to his back while appellant was facing him." Transcript of Proceedings at 269. After Hylton was shot, a pool of his blood was not found by appellant's truck, but rather by the dumpster as would be expected based on Richard Duniver's testimony that he saw Hylton with his back to the dumpster. In addition, Dr. Keith Norton, a forensic pathologist and deputy coroner, described Hylton's wound as a contact wound probably "the result of the gun actually touching the skin at that point." Transcript of Proceedings at 616. Dr. Norton further testified that appellant did not have any injuries on his hands as one would expect if, as appellant contends, appellant had struggled with Hylton. In addition, William B. Mark, a firearms examiner with the Bureau of Criminal Investigation, testified that "there was blast damage around that hole [in Hylton's shirt] and that would lead me to the conclusion that the muzzle of the firearm was in direct contact with the shirt at the time it was discharged. Transcript of Proceedings at 580. Moreover, both Richard Duniver and Sandy Moore testified that appellant earlier had repeatedly threatened Moore's life. All of these factors are consistent with Richard Duniver's testimony that appellant did not act in self defense but rather was the aggressor and created the situation "giving rise to the affray." The jury, who had the opportunity to hear both appellant's and Richard Duniver's testimony and observe their demeanor, clearly found Richard Duniver to be a more credible witness than appellant. Moreover, there was no physical evidence substantiating appellant's account of the shooting. Thus, contrary to appellant's assertion, appellant did not establish the defense of self defense by a preponderance of the evidence. Appellant also challenges his conviction on the basis that there was no evidence that he acted "purposely" in causing Hylton's death as is required by R.C. 2903.02. R.C. 2903.02(A) provides that "[n]o person shall purposely cause the death or another. . . ." "Purposely" is defined in R.C. 2901.22(A) as follows: "A person acts purposely when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature."
"A jury may presume a `specific intention' to cause the death of another where the natural and probable consequences of a defendant's action is to produce death and the jury, from all the surrounding circumstances, may conclude that the defendant had such an intention". State v. Caldwell (1992), 79 Ohio App.3d 667,678. According to appellant, "[w]hat was shown was that appellant was upset at his former girlfriend. Nothing further was introduced which could even reasonably be construed that when the appellant was sitting in his truck at the Eagles, that he specifically intended to confront Fred Hylton with the intent to take his life." We, however, do not agree. As was developed at trial, appellant, who was upset at Moore and had threatened her life three times, went to the Eagles after Moore failed to meet him at the Deep Cut Tavern. When he left the Deep Cut Tavern to go to the Eagles, appellant was "on the warpath". Transcript of Proceedings, at 905. Appellant, who had a loaded gun with him, was sitting in the Eagles' parking lot when Hylton approached him. Appellant himself testified that he grabbed his loaded gun while exiting his truck to confront Hylton. Within only minutes thereafter, Richard Duniver observed appellant facing Hylton, who was up against a dumpster with his hands behind his back. Hylton, who was cornered by appellant, had no weapon on his person. Richard Duniver than observed appellant shoot Hylton point blank with the loaded gun that had been in his truck. Both Dr. Keith Norton and William Mark testified at trial that Hylton's wound probably was caused by the barrel of the gun directly touching Hylton's chest. Clearly, the natural and probable consequence of appellant's actions was to produce death. Thus, there was competent, credible evidence that appellant purposely caused Hylton's death and therefore, was guilty of murder. Based on the foregoing, we find that appellant's conviction for murder was not against the manifest weight or the sufficiency of the evidence. There was sufficient competent, credible evidence supporting appellant's conviction for murder. After reviewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime of murder proven beyond a reasonable doubt. Moreover, the jury, which clearly had the opportunity to observe the witnesses, including appellant, and to assess their credibility, clearly did not lose its way in convicting appellant of murder. Appellant's first and third assignments of error are overruled.
 II
Appellant, in his second assignment of error, argues that the trial court erred by failing to give the jury instruction on self-defense requested by appellant. Appellant had timely proposed the following jury instruction to the trial court: "Test — In deciding whether Loy Grimes had reasonable grounds to believe, and he did in fact actually believe, that the danger of his being killed, or of receiving great bodily harm, was imminent, he may act on such appearances and defend himself, even to the extent of taking human life when necessary although it may turn out that the appearances were false, or although he may have been mistaken as to the extent of the real or actual danger. Further, you must put yourself in the position of the Defendant Loy Grimes with his characteristics and his knowledge, or lack of knowledge and under the circumstances and conditions that surrounded him at the time. You must consider the conduct of the decedent Fred Hylton and decide if his acts and words caused the Defendant Loy Grimes to reasonably and honestly believe that he was about to be killed or receive greatly bodily harm." (Emphasis added.)
Appellant arrived at such instruction by combining the O.J.I. standard instruction with a Colorado Jury Instruction to arrive at a "hybrid form". Transcript of Proceedings at 942. The trial court, however declined to give the above requested instruction, holding as follows: ". . . I've had the opportunity to review the requested jury instructions of self-defense as requested by the defendant which adds to Ohio Jury Instructions Section 411.31 and 35. The term `although it may turn out that the appearances were false, "I've reviewed my notes, I do not find that that is an issue that a charge of that nature should be based on. I feel more comfortable with the so-called standard O.J.I. instructions of self-defense from 411.31, 411.33 and 35." Transcript of Proceedings at 940-941.
Appellant also unsuccessfully requested that the trial court instruct the jury that if evidence of appellant's good character raises in their minds a reasonable doubt of appellant's guilt, they could not find appellant guilty of murder. After the trial court refused to give the instructions requested by appellant, appellant objected on the record to the trial court's denial of his request. It is prejudicial error in a criminal case to refuse to give a requested criminal charge which is pertinent to the case, states the law correctly, and is not covered by the general charge or another special charge. State v. Brady (1988), 48 Ohio App.3d 41,42. The trial court, however, is not required to give the defendant's requested instructions to the jury verbatim but may use its own language to convey the same legal principles. State v. Hicks (1989), 43 Ohio St.3d 72. We find that the trial court did not error in refusing to give appellant's requested instruction on self defense. Whereas the instruction requested by appellant is unsupported by Ohio law, the instruction on self defense that was given by the court was responsive to the evidence and accurately stated the applicable law. Moreover, even assuming, arguendo, that the trial court's failure to give the requested jury instruction on self-defense was erroneous, we find that the failure to give said instruction was harmless error under Crim.R. 52(A). Crim.R.52(A) provides: "Any error, defects, irregularity, or variance which does not affect substantial rights shall be disregarded."
Based on the testimony adduced at trial, including that of Sandy Moore, Richard Duniver, Dr. Norton and William Mark, which is discussed above, we cannot say that, but for the failure to give the alleged jury instruction, the outcome of the trial would have been different since appellant failed to establish the defense of self defense by a preponderance of the evidence. Since the evidence clearly supports a guilty verdict beyond a reasonable doubt, the trial court's failure to give appellant's requested jury instruction on self defense constitutes harmless error. See State v. Mitchell (1989), 60 Ohio App.3d 106, 109. As is stated above, appellant also requested that the trial court instruct the jury as follows: "If the evidence of [appellant's] good reputation, taken in connection with the other evidence, raises in our minds a reasonable doubt of [appellant's] guilt of the murder charge . . . ., you cannot find him guilty of such murder charge."
The trial court, however, chose not to give such instruction opting instead to instruct the jury as follows: "The defendant in this case has offered testimony tending to show his reputation in the community in which he lives. Evidence of this nature is admitted because one who has a good reputation may be less likely to commit an offense than one who lacks that reputation. However, good character or good reputation is not an excuse for an offense. In determining the guilt or innocence of the defendant you must consider the testimony of his reputation and give it such weight as you, the jury, determine it should receive in connection with all of the other evidence." Transcript of Proceedings at 1008-1009.
We find that the trial court did not err in refusing to give appellant's requested instruction since the charge given to the jury by the trial court accurately states the law. Moreover, even if the trial court's refusal to give appellant's requested instruction was erroneous, it was harmless error since, based on the testimony as a whole, we cannot say that, but for the trial court's refusal to give the requested instruction, the outcome of the trial would have been different. The evidence presented at trial clearly supports a guilty verdict beyond a reasonable doubt. Mitchell, supra. Appellant's second assignment of error is overruled.
The Judgment of the Guernsey County Court of Common Pleas is affirmed.
By Edwards, J. Gwin, P.J. and Farmer, J. concur