DECISION
{¶ 1} Defendant-appellant, William A. Banks, appeals from a judgment of the Franklin County Municipal Court finding him guilty of recklessly violating the terms of a protective order in violation of R.C. 2919.27, and theft of a leather jacket in violation of Columbus City Code 2313.02(A)(1), both misdemeanors of the first degree. Defendant assigns a single error:
The trial court erred when it entered judgment against the defendant when the evidence was insufficient to sustain a conviction and the conviction was not supported by the manifest weight of the evidence.
Because sufficient evidence and the manifest weight of the evidence support the trial court's judgment, we affirm.
 {¶ 2} On October 9, 2003, two complaints were filed against defendant alleging that defendant (1) recklessly violated the terms of a protective order by smashing the car window of the victim, Eugenia Griffin, and stealing property out of a vehicle parked within 100 feet of her, and (2) deprived Griffin of property valued at less than $500 by knowingly obtaining control of a leather jacket without her consent. Defendant was arrested the same day.
 {¶ 3} Although defendant originally demanded a jury trial, he subsequently waived that right; on March 16, 2004, the matter was tried to the court. Following presentation of evidence and argument from counsel, the court rendered a decision from the bench, finding defendant guilty of both offenses and explaining the court's analysis of the evidence presented at trial. The trial court sentenced defendant accordingly.
 {¶ 4} On appeal, defendant contends the trial court's finding that defendant was guilty of violating a protective order and theft are not supported by sufficient evidence or the manifest weight of the evidence.
 {¶ 5} To the extent defendant challenges his conviction as not supported by sufficient evidence, we construe the evidence in favor of the prosecution and determine whether such evidence permits any rational trier of fact to find the essential elements of the offense beyond a reasonable doubt. State v. Jenks
(1991), 61 Ohio St.3d 259, 260, paragraph two of the syllabus;State v. Conley (Dec. 16, 1993), Franklin App. No. 93AP-387.
 {¶ 6} When presented with a manifest weight argument, we engage in a limited weighing of the evidence to determine whether the trier of fact's verdict is supported by sufficient competent, credible evidence to permit reasonable minds to find guilt beyond a reasonable doubt. State v. Thompkins (1997),78 Ohio St.3d 380,387
("When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony"); Conley, supra. Determinations of credibility and weight of the testimony remain within the province of the trier of fact. State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
 {¶ 7} According to the prosecution's evidence, Eugenia Griffin had a relationship with defendant off and on from the age of 14 to adulthood, and she and defendant had a child together. The year preceding the trial was the most recent time such a relationship existed, and it ultimately deteriorated to the point that in August 2003, Griffin procured a protective order from the domestic relations court against defendant. Issued on August 14, 2003, the order was effective for a period of five years, and required, among other things, that defendant stay away from Griffin and not be present within 500 yards of her, even with her permission.
 {¶ 8} On October 9, 2003, Griffin was living at 1369 Indianola Avenue. About five o'clock in the morning, Griffin was downstairs asleep when she heard her step-sister Stacie Sydnor, whom Griffin referred to as her sister, yell "I see you, Will." (Tr. 11.) Sydnor and Griffin's son ran down the steps where they saw defendant outside in front of Griffin's car. By the time Griffin got to the door, she saw defendant "running up the hill to a neighbor's side where he had a bag." (Tr. 11.) She saw him bend down, put something in the bag, turn back around, give Griffin a "cocky grin," and then jump over a banister. (Tr. 21.) Griffin called 9-1-1 and advised she had a protection order, defendant was violating it, and someone should be sent quickly. According to Griffin, at the time she made the telephone call, defendant was still there; she was watching him as she made the call. She also observed that the back window of her car, parked in front of her residence, was broken and her black leather jacket was missing from the vehicle.
 {¶ 9} At 5:10 a.m. on October 9, 2003, Officer Steven Warrick received a call to 1369 Indianola. He there took a report and walked the distance from Griffin's car to her residence Because the car was within 43 feet of the front door, he concluded defendant had violated the protective order. He also examined the car and observed a smashed-out back window. Griffin pointed out that her leather jacket was gone. While Officer Warrick could see the leather jacket was not in the car, he did not have independent knowledge whether defendant took it.
 {¶ 10} Sydnor's testimony corroborated much of Griffin's testimony. Specifically, Sydnor stated she was upstairs in Griffin's room when she heard a loud noise at Griffin's car. She looked out the bedroom window and saw defendant breaking out the car window. She said "I see you, Will." (Tr. 37.) She ran down the steps, calling Griffin's name, and went to the front door where she saw defendant had grabbed Griffin's jacket out of the car and run onto the neighbor's porch next door. Defendant had a bag on the porch, put Griffin's jacket in the bag, and ran down the side of the houses. Sydnor ran to the back door to see if she could find him, but saw nothing.
 {¶ 11} Nonetheless, the testimony of Griffin and Sydnor do not correspond precisely. According to Sydnor, Griffin was so afraid she initially would not even come to the door, so that by the time Griffin did so, defendant was gone. Griffin, by contrast, testified she first saw defendant as he was running up a hill to the neighbor's side, and then testified she saw him in the light produced by the streetlight near her car. Thus, Griffin's own testimony on that point is internally inconsistent and at odds with Sydnor's testimony.
 {¶ 12} Defendant's testimony diverged dramatically from that of the prosecution's witnesses. By way of background, defendant explained he had been imprisoned for approximately 11 years for involuntary manslaughter and was released on parole in August 2002. He lived for a couple of months at Faith Mission downtown and then lived at 1503 East Maynard Avenue. Around August 2003, defendant had a dispute with Griffin, she called his parole officer, and defendant not only was locked up but had the protective order issued against him. Defendant was released on August 19.
 {¶ 13} Almost immediately after defendant's release, Griffin called him and said she wanted to see him. Defendant refused because he did not want to risk going back to prison. Around two o'clock the following morning, Griffin drove to the place on Maynard Avenue where defendant was staying and beeped her car horn four times, a signal she and defendant understood. Defendant went out to her and let the person he was staying with know that "there was trouble out front." (Tr. 58.) When defendant approached the car, he lied to Griffin, telling her that in the house was the woman with whom defendant had "cheated" on Griffin. (Tr. 58.) Defendant testified Griffin drove off in tears, but knew defendant was due to see his parole officer. As soon as defendant arrived for his meeting with his parole officer, defendant again was incarcerated
 {¶ 14} According to defendant, he was released on October 7, subject to a monitor that would demonstrate he had not been near Griffin. Unfortunately, a monitor was unavailable the day he was released. Defendant touched base with his parole officer on October 8, who advised him he did not need to come in until the following day.
 {¶ 15} On October 8 and 9, defendant stayed at his friend's place on Maynard Avenue. He was awakened a few minutes before 5:00 a.m. to the sound of Griffin's horn; Sydnor was with Griffin. According to defendant, they were there "to deliver threats to have me locked up." (Tr. 60.) Defendant woke his friend and told him "[t]his time, I'm not going out there, I'm just going to stick my head out the door." (Id.) When defendant asked Griffin what she wanted, she listed his wrongs and ended by stating "I'm going to make sure that you get locked back up. * * * I don't have to say much, nor will it cost me much, but you're going to get locked back up." (Tr. 61.) Defendant knew Griffin had talked with the parole officer, because she mentioned the monitor.
 {¶ 16} Defendant testified the incident so scared him he first called his parole officer to get permission to contact the police. Apparently receiving permission, defendant waited for about one-half hour, called the police and asked the police to come; Officer Rogan arrived about 6:00 a.m. Officer Rogan explained he could not make a report because defendant did not have a protection order against Griffin; rather, she had one against him. Officer Rogan suggested defendant contact the prosecutor's office to see what could be done about the situation. According to defendant, he never had a chance to do so, because his parole officer arrested him that day. Defendant unequivocally testified he was not within 500 feet of Griffin's residence on October 9, he did not break the window of her car that day, and he did not take her jacket out of the car.
 {¶ 17} Officer Rogan testified that he was dispatched to the Maynard Avenue address on October 9, 2003 due to a disturbance "that somebody had — was in violation of some kind of protection order." (Tr. 48.) Once Officer Rogan arrived, defendant inquired how to keep Griffin away. Officer Rogan admitted he was not sure of the date of the dispatch, and believed he was at the address in early afternoon, between 12:30 and 1:00 p.m.
 {¶ 18} Defendant's challenge to the sufficiency of the evidence does not contest any single element of the offenses of which he was convicted. Rather it rests on divergent testimony presented to the trial court and, on that basis, challenges the trial court's conclusion he was present at Griffin's residence at the time of the incident giving rise to the charges against him. Pointing to his own testimony and that of Officer Rogan, defendant urges he was not at Griffin's residence at 5:00 a.m. on October 9, 2003, but remained at the Maynard Avenue address. While defendant accurately notes the discrepancies, we construe the evidence in favor of the prosecution in assessing the sufficiency of the evidence.
 {¶ 19} Here, the testimony of the prosecution's witnesses, if believed, provides sufficient evidence to support the trial court's conclusion defendant was present at Griffin's home at the time of the incident involving Griffin's car and jacket. Specifically, Sydnor testified she heard a noise that awakened her, she went to the window and she there observed defendant smash Griffin's car window and saw Griffin's jacket in his hand. The parties stipulated the validity of the protection order in effect on that day, and Officer Warrick testified that defendant's presence placed defendant closer to Griffin than the protective order allowed.
 {¶ 20} Defendant contends, however, that the manifest weight of the evidence fails to support his conviction. While our review of the manifest weight of the evidence involves limited weighing of the evidence, inconsistencies in the testimony generally do not render the verdict against the manifest weight of the evidence. State v. Thompson (1998), 127 Ohio App.3d 511, discretionary appeal not allowed, 83 Ohio St.3d 1451 (stating that "[a] reviewing court must, therefore, accord due deference to the credibility determinations made by the fact-finder");State v. Craig (Mar. 23, 2000), Franklin App. No. 99AP-739, citing State v. Nivens (May 28, 1996), Franklin App. No. 95APA09-1236 (noting that "[w]hile the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence"). Indeed, the trier of fact need not believe all of a witness' testimony, but may accept only portions of it as true. State v. Burke,
Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing State v.Caldwell (1992), 79 Ohio App.3d 667.
 {¶ 21} Applying those principles here, we cannot conclude the testimony as a whole, however divergent, renders the prosecution's testimony so beyond belief that a reasonable trier of fact could not accept it as true. For example, defendant relies heavily on his own testimony that Griffin was at his house at approximately the time defendant purportedly was smashing the window out of her car near her residence. The trial court, however, explained why it found defendant's testimony unpersuasive.
 {¶ 22} Initially, the trial court acknowledged but rejected defendant's argument that Griffin and Sydnor had a reason to lie and attempt to place defendant back in prison, the court found no motive on the part of the two witnesses to lie. The trial court also noted that Officer Warrick found physical evidence, the broken window at the scene, and the court further observed that both Griffin and Sydnor testified they saw defendant stuff something into a bag. Coupling that evidence with Griffin's testimony that the jacket was in the car prior to the incident, but after the incident was not, the court concluded the evidence supported defendant's taking the jacket from a place that violated the protective order.
 {¶ 23} The trial court further acknowledged the interesting twist Officer Rogan's testimony lent to these charges, in that defendant contacted police for assistance in barring Griffin's purported attempt to set him up to additional charges. The court, however, considered the time element mentioned in the testimony of both Officer Rogan and defendant.
 {¶ 24} As the court explained, Officer Rogan's typical shift was from 6:00 a.m. to 2:00 p.m. "And if that's what happened here on October the 9th, the phone call from Mr. Banks that triggered the response of Mr. Rogan came in after these events occurred. And so what a perfect setup * * * by Mr. Banks to try to deflect the real harm that has already occurred, because of the fact that he's made contact with Miss Griffin and violated the terms of his order." (Tr. 77.) Although the court admitted the decision was one it struggled with, the court found "sufficient independent corroboration in my mind, based on Officer Warrick's testimony and the fact that I do believe I have eyewitness testimony in this case. So I do find him guilty." (Tr. 78.)
 {¶ 25} Indeed, Officer Rogan's testimony is not consistent with defendant's testimony. Officer Rogan testified he was dispatched to the Maynard Avenue address in the afternoon around 12:30 p.m. to 1:00 p.m.; defendant's testimony that Officer Rogan arrived around 6:00 a.m. suggests Officer Rogan left for the Maynard Avenue address before his shift started. Moreover, as the prosecution points out, even if the court accepted defendant's testimony that Griffin and Sydnor were at the Maynard Avenue address shortly before 5:00 a.m., that evidence does not preclude defendant from (1) following them back to Indianola Avenue, a drive of about five minutes, where he smashed the car window and took the jacket that prompted Officer Warrick's dispatch at 5:10 a.m., (2) returning to Maynard Avenue, and (3) arriving in time to place a call to the police at approximately 5:30 a.m.
 {¶ 26} In the final analysis, resolution of defendant's charges became a matter of credibility for the trial court to assess. Given the testimony before the trial court, we cannot conclude the trial court lost its way in finding the prosecution's evidence more persuasive than defendant's evidence. Accordingly, we overrule defendant's single assignment of error and affirm the judgment of the trial court.
Judgment affirmed.
Brown and Klatt, JJ., concur.