DECISION
Barbara and John Basilone, plaintiffs-appellants, appeal the June 13, 2000 judgment of the Ohio Court of Claims finding that the Ohio Department of Transportation ("ODOT"), defendant-appellee, was not negligent in its maintenance of a public roadway.
Reconstruction of Interstate 76 ("I-76"), in Akron, Ohio, began in March 1994. During the last phase of a three-phase project, temporary concrete barriers were installed between the edge of the driving lane and the edge of the passing lane, thereby making the former driving lane the passing lane, the former shoulder the driving lane, and a dirt border the new shoulder. There was twelve inches of pavement between the white edge stripe and the new dirt shoulder. The speed limit was lowered through the entire project area to forty-five miles per hour, which was indicated via standard regulatory signage.
During the course of phase three, a drop-off/rut was created between the edge of the road and the new dirt shoulder as a result of the tires of cars and trucks drifting off the right edge of the paved road. David Nist, ODOT's project engineer for the construction area at issue, testified that ODOT made attempts on two occasions in May and October 1996 to repair the drop-off by filling in the ruts with gravel and limestone. The repair work caused significant traffic congestion and hazards due to necessary lane closures for six to eight hours. However, ruts again developed within three or four days. In order to maintain the one and one-half inch elevation, Nist opined that they would have had to repeat the entire process about every other day, which he said would have been ineffective and dangerous. Nist stated that because they could not maintain the rutted area properly, the method of correction used to alert the public of the condition consisted of installing two six-foot by eight-foot, illuminated message boards on the side of the road at the entrance of the construction zone indicating: "low shoulder, 45 miles per hour" on one screen and "next two miles" on the other. The first message flashed for approximately five seconds, followed by a one-second delay, then the second message was displayed.
On the morning of December 14, 1996, Mrs. Basilone was driving a 1995 GMC Suburban westbound in the left lane of I-76 in the phase three construction zone, which she traveled numerous times during the preceding year. Mr. Basilone was a passenger in the vehicle. The speed limit in the construction zone was forty-five miles per hour, and Mrs. Basilone testified that she was traveling with the flow of traffic, which was exceeding the speed limit. After moving into the right lane, the right front tire of the Suburban drifted off the paved surface and fell into a rut between the concrete edge of the roadway and the dirt shoulder. There was a wide "recovery area" on the dirt shoulder and then a slightly sloping grassy hill area beyond the flat dirt shoulder. There were no guardrails or other barriers on the shoulder.
Mrs. Basilone testified that after she drove off the side of the road, she struggled to turn the steering wheel to get out of the rut and reenter the roadway. Mr. Basilone testified that after he heard gravel hit the wheel wells, he leaned forward, saw his wife trying to turn the steering wheel to get back onto the paved roadway, and said "hold it, hold it." After Mrs. Basilone turned sharply back onto the roadway, the vehicle crossed both westbound lanes and crashed head on into the concrete barrier along the edge of the interior lane. As a result of the accident, Mrs. Basilone sustained numerous bodily injuries. Mr. Basilone suffered less serious injuries.
Mr. Basilone testified that he went back to the scene of the accident later that day and discovered some of the ruts measured from four to twelve inches in depth. Tom Pavlish, a private investigator, testified that his measurements revealed drop-offs in the approximate range of three and one-half to four inches in depth, some being more and some being less. Nist testified that at least one rut appeared to be about five inches deep, and the ruts were sporadic for a 2,300 foot stretch. Appellants were uncertain exactly where the vehicle went off the road or the depth of the ruts at that particular point.
On January 13, 1997, appellants filed a complaint in the Ohio Court of Claims against ODOT, alleging negligence by ODOT in failing to maintain the roadway and shoulder of I-76. The case was bifurcated, and a trial on the liability portion of the claim was held on February 14 and 15, 2000. On June 13, 2000, the court filed a decision and judgment entry. The court found that ODOT had met its duty to maintain the roadway in a reasonably safe condition for the driving public by posting warning signs and lowering the speed limit in the construction zone. The court further found that, even assuming that ODOT was negligent, appellants were barred from recovery because Mrs. Basilone's comparative negligence was greater than the negligence of ODOT, i.e., greater than fifty percent. The court found that Mrs. Basilone failed to use reasonable care when she drove off the paved surface of the roadway and then attempted to reenter the roadway by over-steering to the left.
Appellants now appeal the judgment of the Court of Claims, asserting the following assignments of error:
ASSIGNMENT OF ERROR NO. 1:
 THE TRIAL COURT ERRED IN FINDING THAT THE DEFENDANT OHIO DEPARTMENT OF TRANSPORTATION MET ITS DUTY OF CARE TO THE MOTORING PUBLIC TO KEEP A ROAD IN REPAIR WHERE THE EVIDENCE SHOWS THAT DEFENDANT PERMITTED A CONTINUOUS SHARP ROAD EDGE DROP OFF OF BETWEEN ONE AND ONE-HALF AND FIVE INCHES TO EXIST, UNREPAIRED, FOR ONE YEAR ALONG A 45 MPH ROAD HAVING A TRAFFIC VOLUME OF 52,000 VEHICLES PER DAY.
 ASSIGNMENT OF ERROR NO. 2:
 A MOTORIST WHOSE FRONT TIRE IS SUDDENLY TRAPPED IN A DANGEROUS ROAD EDGE DROP OFF IS CONFRONTED WITH A SUDDEN EMERGENCY AND CANNOT BE FOUND TO BE NEGLIGENT IN TRYING TO REGAIN THE PAVED ROAD SURFACE.
In appellants' first assignment of error, they argue that the Court of Claims erred in finding that ODOT did not breach its duty of care. Appellants essentially argue that the court's decision was against the manifest weight of the evidence.
The standard of review in manifest weight cases has been clearly established. In determining whether the judgment of the trial court is against the manifest weight of the evidence, a reviewing court must be guided by the presumption that the findings of the trial court are correct, as the trial judge is best able to view the witnesses and observe their demeanor, gesture, and voice inflections and use these observations in weighing the credibility of the proffered testimony.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80. The Ohio Supreme Court has held that:
 Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence. C.E. Morris Co. v. Foley Construction Co. (1978), 54 Ohio St.2d 279, syllabus.
In order to prove that ODOT was negligent, appellants had to establish by a preponderance of the evidence that ODOT owed them a duty, that ODOT breached that duty, and that the breach of that duty was the proximate cause of their injuries. Littleton v. Good Samaritan Hospital HealthCtr. (1988), 39 Ohio St.3d 86, 92. It is well-established that ODOT has a general duty to maintain and repair state highways. White v. Ohio Dept.of Transp. (1990), 56 Ohio St.3d 39, 42. However, ODOT is not an insurer of the safety of the state's highways. Rhodus v. Ohio Dept. of Transp.
(1990), 67 Ohio App.3d 723, 730.
In Feichtner v. Ohio Dept. of Transp. (1995), 114 Ohio App.3d 346, we discussed ODOT's duty to the traveling public in construction zones. We recognized that ODOT cannot guarantee the same level of safety during a highway construction project as it can under normal traffic conditions.Id. We further acknowledged that ODOT is, nonetheless, required to provide the traveling public with a reasonable degree of safety in construction zones by way of utilizing traffic control barrels, reducing the applicable speed limit, and erecting construction warning signs. Id.
In addition, we found that a court must look at the totality of the circumstances in determining whether ODOT acted sufficiently to render the highway reasonably safe for the traveling public during the construction project. Id., see, also, Lumbermens Mut. Cas. Co. v. OhioDept. of Transp. (1988), 49 Ohio App.3d 129.
William Jackman, a forensic engineer, testified as appellants' expert. Jackman testified that the accident was caused by a "slingshot" effect, which occurs when a driver turns the steering wheel sharply to regain entrance from a rut back onto the roadway. The tire finally "bites" back onto the driving surface, and the car cuts sharply back onto the road with little ability to control it. He stated that Ohio has maintenance standards that do not permit a drop-off of more than one and one-half inches and that the exhibit photographs depict drop-offs greater than this depth. He stated that even though ODOT's expert, Paul Box, believed that the average drop-off was within the acceptable range, there was still the potential for a significant danger if a driver were to drive into one of the deeper ruts. He also stated that although Box believed that four inches was a reasonable drop-off, negotiable by somebody who was expecting it in a controlled situation with no traffic, "[t]he fact remains that accidents happen with such drop-offs, and the State instituted a standard to meet those needs." He stated that a 1986 memorandum from the Federal Highway Administration which is only a guideline indicated that drop-offs greater than two inches have high accident potential and are hazards. Jackman also testified that using a flashing, changeable message board would not eliminate the danger created by the drop-off. He testified that to a reasonable degree of engineering certainty, it was his belief that ODOT breached its duty to maintain the berm according to the appropriate standards, and ODOT's lack of proper maintenance of the shoulder was the proximate cause of the accident.
On cross-examination, Jackman testified that the drop-offs varied along the roadway from one inch to about four and one-half inches. He stated that he did know whether the "prevailing" drop-off the average or median drop-off depth was one and one-half inches or less. He further acknowledged that if Mrs. Basilone had not turned the wheel to the left and encountered the pavement with her right tire, she could have proceeded down the road and pulled off or waited for a more level area to return to the roadway.
Paul Box, a traffic engineering consultant, testified as an expert for ODOT. He testified regarding ODOT's "Dropoffs in Work Zones" guidelines ("drop-off guidelines"), which indicated that for drop-offs with a "prevailing" depth of one and one-half inches or less, only edge lines are required. He testified that he believed the drop-offs in the present case were not continuous, occurring only every five to ten feet, and that the typical drop-off, or "prevailing" drop-off was in the one and one-half inch range. Therefore, Box opined that no further treatment of the berm was necessary. He also testified that it was reasonable for ODOT to erect warning signs under the circumstances. He further stated that because there was not a continuous drop-off of four inches or more, ODOT did not violate any provision of Chapter 7 of the Ohio Manual of Uniform Traffic Control Devices ("OMUTCD"). He testified that the fact no other motorists had similar accidents on that portion of the roadway was convincing evidence to support his opinion. He believed that if this were truly an unusually hazardous situation, there would have been other accidents. Box also stated that there was a good, level recovery area at least ten feet wide — two to three times the recovery area that would have been necessary — and there were no obstructions to prevent a recovery. Box further testified that Mrs. Basilone could have and should have operated her vehicle safely once her tires dropped off the edge. Box opined that to a reasonable degree of engineering probability, the construction zone at issue was reasonably safe for motorists.
Viewing the present facts under the totality of the circumstances, we find that the trial court's decision that ODOT was not negligent in its maintenance of the roadway was not against the manifest weight of the evidence. The factual issues were largely undisputed. Thus, the only question was the testimony of the expert witnesses. The relative weight to be given the expert testimony and the credibility to afford each of these witnesses was a question for the trier of fact. See State v.Frazier (1995), 73 Ohio St.3d 323, 339; State v. Rojas (1992),64 Ohio St.3d 131, 139. Thus, the trial court was free to believe all, part, or none of the testimony of each of the expert witnesses who appeared before it. State v. Nichols (1993), 85 Ohio App.3d 65, 76; Statev. Caldwell (1992), 79 Ohio App.3d 667, 679.
The trial court simply found Box's opinion regarding ODOT's negligence more persuasive than Jackman's opinion. We discern no error in that finding. First, Box testified that the drop-off did not violate ODOT's drop-off guidelines or Chapter 7 of the OMUTCD. General note #4 in the drop-off guidelines indicates that the "drop-off treatment selected for use at any given location shall be as appropriate for the prevailing
conditions at the site." (Emphasis sic.) Although there were some drop-offs that were certainly deeper than one and one-half inches, Box testified that he believed the prevailing drop-off was one and one-half inches, which would require no further treatment other than an edge line according to ODOT's drop-off guidelines. Jackman testified that he did not know the prevailing drop-off for the area. Further, Box stated that because there was not a continuous drop-off of four inches, the OMUTCD did not require any object markers or other warning indicators on the berm.
Second, the trial court could have reasonably relied upon Box's opinion that installing the flashing signs was reasonable and acceptable. SeeLumbermens, supra, paragraph two of the syllabus ("Safe travel may be assured by the state by adequate repairs of the highway, by the installation of signs adequately warning of a danger, or by a combination of these and other measures, depending on the circumstances."). In addition, Nist testified that signage was the only practical solution because it would have been inefficient and hazardous to close down one lane of traffic every few days in order to constantly repair the ruts. Because of the impracticality and danger posed by such frequent lane closures, the court could have reasonably found that placing warning signs and reducing the speed limit were the only feasible solutions. SeeRandles v. Ohio Dept. of Transp. (Aug. 4, 1998), Franklin App. No. 97API11-1449, unreported (holding that the trial court did not abuse its discretion in finding that the use of edge line markings would have been impractical during construction and road repair and that posting of speed limits and other warning signs rendered the roadway reasonably safe for motorists). Thus, we find that the trial court did not err in finding Box's opinion persuasive (that installing warning signs in the construction zone at issue rendered it reasonably safe for motorists).
Third, we also find compelling Box's reliance upon Nist's testimony, which pointed out that no other motorists had any similar accidents on that portion of the roadway. Box stated that this statistic provided convincing evidence as to the adequacy of precautions taken by ODOT. Further, both Box and Jackman agreed that ODOT provided adequate recovery room on the side of the road. Box opined that Mrs. Basilone could have proceeded down the recovery area (shoulder) and pulled off or waited for a more level area to return to the roadway. Our review of the photographs of the scene reveals that there was a substantial, flat, unobstructed recovery area provided by ODOT.
We further note that appellants cite Dickerhoof v. Canton (1983),6 Ohio St.3d 128, for the proposition that a political subdivision may be liable for injuries resulting from its failure to keep the shoulder of a highway in repair and free from nuisances, such as chuckholes and ruts, which would render the highway unsafe for normal travel, because the shoulder of a highway is designed to serve a purpose that may include travel under emergency circumstances. Although Dickerhoof does stand for this proposition, there are key differences between the facts inDickerhoof and the facts in the present case. In Dickerhoof, the vehicle left the roadway because it swerved to miss an object in the road and, thus, was forced to drive on the shoulder. In the case before us, appellants do not argue that there was an obstruction in the roadway or that Mrs. Basilone left the roadway for any reason other than inattention to the right edge line. No emergency purpose for using the area outside the normal driving lanes existed, except for the emergency caused by appellant herself. Moreover, in Dickerhoof, a chuckhole in the shoulder actually caused the accident. In this case, the evidence did not support the view that the rut in the berm itself constituted a nuisance to traffic on the roadway but, rather, did so only when a vehicle left the regularly traveled portion of the roadway and then tried to immediately and sharply reenter the roadway. These differences are significant enough to render the holding in Dickerhoof incongruent with the facts of this case.
Therefore, in viewing the totality of the circumstances, we find that the trial court's decision was not against the manifest weight of the evidence. ODOT took reasonable precautions to alert the motoring public of the condition of the berm through substantial signage and reduction of the speed limit. There was competent, credible evidence to support the trial court's finding that ODOT did not breach its duty to maintain the roadway in a reasonably safe condition. Appellants' first assignment of error is overruled.
Appellants argue in their second assignment of error that the Court of Claims erred in finding that Mrs. Basilone was comparatively negligent. Because we have determined that ODOT was not negligent, the issue of comparative negligence as it relates to appellants' cause of action against ODOT is moot, and we decline to address it. See App.R. 12(A)(1)(c).
Accordingly, appellants' first assignment of error is overruled, their second assignment of error is moot, and the judgment of the Ohio Court of Claims is affirmed.
TYACK and PETREE, JJ., concur.