[Cite as *State v. Bugara*, 2019-Ohio-39.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | : | JUDGES: |
| | : | Hon. John W. Wise, P.J. |
| Plaintiff-Appellee | : | Hon. W. Scott Gwin, J. |
| | : | Hon. Earle E. Wise, Jr., J. |
| -vs- | : | |
| | : | |
| TYLER BUGARA | : | Case No. 2018CA00039 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |

CHARACTER OF PROCEEDING:             Appeal from the Court of Common
                                     Pleas, Case No. 2017CR0884

JUDGMENT:                            Affirmed

DATE OF JUDGMENT:                    January 7, 2019

APPEARANCES:

For Plaintiff-Appellee                        For Defendant-Appellee

JOHN D. FERRERO                               AARON KOVALCHIK
KATHLEEN O. TATARSKY                          116 Cleveland Avenue NW
110 Central Plaza S - Suite 510               808 Courtyard Centre
Canton,  OH 44702                             Canton,  OH 44702

*Wise, E., J.*

{¶ 1}   Defendant-Appellant Tyler Bugara appeals the March 1, 2018 judgment of conviction and sentence of the Court of Common Pleas of Stark County, Ohio. Plaintiff-Appellee is the state of Ohio.

## FACTS AND PROCEDURAL HISTORY

{¶ 2}   In March 2017, S.B worked as a waitress at Grinder's in Alliance, Ohio. S.B ended a relationship that month and on March 12, her coworkers Jamie Callahan and Tanette Preas thought getting S.B out for an evening would get her mind off the breakup.

{¶ 3}   At approximately 10:30 that evening, they arrived at Rey's, a bar in Alliance. Others joined as well, including Bugara, who was S.B's supervisor at Grinder's.

{¶ 4}   S.B started out drinking Crown Royal and coke, and when others did not finish their drinks, she did. She also did some shots. Bugara was flirty with S.B that evening and S.B was flirty in return. Everyone was having a good time.

{¶ 5}   At some point, however, due to the amount of liquor she consumed, S.B went outside and vomited. Realizing she was too drunk to drive, she went back into the bar and asked Callahan and Preas if they would like to walk with her to her apartment, about a mile and a half away, and stay with her since they had both been drinking as well. When they left on foot at approximately 2:00 a.m. S.B thought both Callahan and Preas had decided to go to her place, but as they walked toward her apartment, she realized it was Callahan and Bugara with her.

{¶ 6}   When she tried to recall the events of the evening the following day, S.B did not recall actually leaving the bar, but did recall the walk home and feeling sick. During

the walk home, S.B fell once in the snow. She recalled Callahan and Bugara ahead of her with their arms around each other and laughing.

{¶ 7}   S.B did not recall inviting Bugara, but did not dissuade him from joining them as she did not feel threatened. Once at her apartment, Callahan asked S.B for clothes to sleep in. When S.B bent over to find clothing for Callahan in her bottom dresser drawer, she fell over. S.B later remembered Callahan's voice, and that she was trying to get S.B off the floor and into bed, but S.B just wanted to stay on the floor because Callahan touching her and moving her made S.B feel like she was going to vomit again.

{¶ 8}   Callahan left S.B where she fell. She and Bugara then ate what they found in S.B's refrigerator and drank liquor they found in the house as well. Callahan then fell asleep on the sofa.

{¶ 9}   The next thing S.B recalled was waking up due to pain in her anus. She was on her side on her bed and Bugara was behind her with his penis inserted in her rectum. S.B passed out again.

{¶ 10} S.B next woke to Callahan frantic because she did not know what time it was and both she and S.B had to be at work. Once fully awake, S.B noticed she was in bed with the covers pulled up over herself, and that her work clothing was half off. Her shirt was pulled up and her bra unhooked. Her pants and underwear were pulled down to mid-thigh. Bugara was gone.

{¶ 11} S.B contacted her father to take her and Callahan to their cars. She did not say anything to Callahan about what happened, because she did not want to believe it happened. The event seemed dream like to her. But when S.B started dressing herself, she noticed her anus hurt. She further noted her knee hurt when walking.

{¶ 12} S.B's father took her and Callahan to their cars. S.B did not mention anything to her father either as she did not know how to raise such a subject with her father.

{¶ 13} Once home again, S.B looked at the blue sheets on her bed and noticed a semen stain, which confirmed her suspicions. She called her brother and asked him to come over. S.B's brother took her to Alliance Hospital where she reported she had been sexually assaulted. As per protocol, hospital staff contacted police. Officer Patrick Kelly of the Alliance Police Department responded to the hospital and spoke with S.B. He interviewed S.B while wearing a point of view camera which recorded the interview. S.B was visibly shaken and upset while she relayed the above outlined events to Kelly. She gave Kelly the keys to her apartment and permission to search the same. Kelly contacted his shift commander and requested a detective to meet him at the apartment as he believed there would be evidence to collect.

{¶ 14} Detective Matthew Shatzer met Kelly at S.B's apartment. Shatzer photographed the bedroom as well as the rest of the apartment. Because S.B had stated she believed there was semen on the bed sheets, Shatzer used an alternative light source on the sheets which revealed an area of possible body fluids on the fitted sheet. The sheets were collected as evidence.

{¶ 15} Because Alliance Hospital does not have a Sexual Assault Nurse Examiner (SANE) on staff, S.B was sent to Aultman Hospital for a sexual assault examination. After processing the scene at the apartment, Shatzer went to Aultman to speak with S.B. He found S.B upset, but she relayed the same sequence of events to Shatzer as she had to

Kelly. When Shatzer spoke with S.B two days later, her recall of events remained the same.

{¶ 16} Shatzer also spoke with Callahan. The evening of March 12, 2017 was the first time Callahan had ever socialized with S.B. Callahan confirmed they were all at Rey's after work at Grinder's and that all felt too drunk to drive. She further confirmed that S.B passed out on her bedroom floor while she was trying to get clothing for Callahan to sleep in. Callahan stated she and Bugara tried to get S.B into bed without success, so they left her on the floor. She further recalled herself and Bugera drinking some more and eating before she went to sleep on the sofa. In the morning, she awoke on the sofa and noted Bugera was gone. Although she had never heard S.B invite Bugera into her bedroom, she thought maybe he was in S.B's bedroom, but did not find him there. S.B was alone in her room on her bed. Callahan noted S.B seemed hungover, but she gave Callahan no indication that anything else was wrong.

{¶ 17} Karen Rowlands is a SANE nurse at Aultman Hospital and performed S.B's sexual assault examination. Rowlands swabbed several areas of S.B's body including anal, perianal and vaginal regions. She sealed these swabs and other evidence in envelopes, placed them in the rape kit and gave the kit to Shatzer. Shatzer delivered the kit and the sheets recovered from S.B's bed to the Bureau of Criminal Investigations Crime Laboratory (BCI).

{¶ 18} Sara Horst is a forensic biologist at the BCI. She examines items of evidence for the presence of bodily fluids. She examined S.B's oral, anal, perianal and vaginal swabs. None of the swabs contained sperm cells, but one was positive for

semen. Horst did find sperm cells on the fitted sheet. The sheet and the anal and perianal swabs were sent to the DNA section of the BCI laboratory for further analysis.

{¶ 19} Emily Feldenkris works in the DNA section of the BCI. She further examined the fitted sheet. Using a DNA standard developed from an oral swab submitted to the lab from Bugara, Feldenkris was able to develop a DNA profile from the sperm cells on the fitted sheet and compare it to Bugara's DNA profile. Feldenkris concluded that the likelihood of the stain being left by anyone other than Bugara was one in one trillion.

{¶ 20} Male-specific Y-STR testing was conducted on S.B's anal and perianal swabs. This type of testing looks for DNA found on the Y-chromosome and thus possessed only by men. Bugara was consistent with the male DNA found on the anal and perianal swabs. The profile isolated from the swab would not be expected to occur more frequently than 1 in 700 males in the United States population. This statistic – 1 in 700 – is the rarest Y-STR estimate observed.

{¶ 21} As a result of these events, on June 23, 2017, the Stark County Grand Jury returned an indictment charging Bugara with one count of rape pursuant to R.C. 2907.02()(1)(a), a felony of the first degree and one count of sexual battery pursuant to R.C. 2907.03(A)(1) and/or (A)(2), a felony of the third degree. Bugara pled not guilty to the charges and elected to proceed to a jury trial, which began on February 20, 2018. Before trial began, the state dismissed the single count of rape.

{¶ 22} The state called seven witnesses, including S.B. Bugara called one witness - Preas. During Preas' testimony, Bugera attempted to introduce text messages between Preas and S.B. The state objected because Bugera had not disclosed the texts

during discovery, nor during the state's case-in-chief. Instead, counsel for Bugera had waited until late the afternoon before to disclose this evidence, and disclosed only one text message at that time. The court limited Bugara to asking if Preas was in contact with S.B at 3:59 a.m the morning in question, which Preas answered in the affirmative. The trial court excluded, however, the content of the texts. Bugara made no proffer as to the content of the texts.

{¶ 23} After hearing all the evidence and deliberating, the jury returned a verdict of guilty of the charge of sexual battery. Bugara was sentenced to four years in prison and was classified as a Tier III sexual offender.

{¶ 24} Bugara filed an appeal, and the matter is now before this court for consideration. He raises three assignments of error:

{¶ 25} THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT DID NOT ALLOW EITHER EVIDENCE TO BE PRESENTED BY APPELLANT OR A BRIEF RECESS TO REVIEW THE EVIDENCE.

{¶ 26} APPELLANT WAS DENIED HIS SIXTH AMENDMENT RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 27} APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT AND SUFFICIENCY OF THE EVIDENCE.

I

{¶ 28} In his first assignment of error, Bugara argues the trial court abused its discretion when it prohibited him from introducing text messages during his direct examination of Preas. We disagree.

{¶ 29} First, we review a trial court's decision regarding allegations of non-compliance with discovery rules under an abuse of discretion standard. Crim.R. 16(L). In order to find an abuse of discretion, we must determine the trial court's decision was unreasonable, arbitrary or unconscionable and not merely an error of law or judgment. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 450 N.E.2d 1140 (1983).

{¶ 30}      Next, Crim.R. 16(A) sets forth the general purpose of Crim.R.16 and states:

**Purpose, Scope and Reciprocity.** This rule is to provide all parties in a criminal case with the information necessary for a full and fair adjudication of the facts, to protect the integrity of the justice system and the rights of defendants, and to protect the well-being of witnesses, victims, and society at large. All duties and remedies are subject to a standard of due diligence, apply to the defense and the prosecution equally, and are intended to be reciprocal. Once discovery is initiated by demand of the defendant, all parties have a continuing duty to supplement their disclosures.

{¶ 31} Third, as stated in Crim.R. 16(A), discovery rules are reciprocal. Crim.R. 16(H) sets forth a defendant's responsibilities under the rule:

**(H) Discovery: Right to Copy or Photograph.** If the defendant serves a written demand for discovery or any other pleading seeking disclosure of evidence on the prosecuting attorney, a reciprocal duty of disclosure by the defendant arises without further demand by the

state. A public records request made by the defendant, directly or indirectly, shall be treated as a demand for discovery in a criminal case if, and only if, the request is made to an agency involved in the prosecution or investigation of that case. The defendant shall provide copies or photographs, or permit the prosecuting attorney to copy or photograph, the following items related to the particular case indictment, information or complaint, and which are material to the innocence or alibi of the defendant, or are intended for use by the defense as evidence at the trial, or were obtained from or belong to the victim, within the possession of, or reasonably available to the defendant, except as provided in division (J) of this rule:

(1) All laboratory or hospital reports, books, papers, documents, photographs, tangible objects, buildings or places;

(2) Results of physical or mental examinations, experiments or scientific tests;

(3) Any evidence that tends to negate the guilt of the defendant, or is material to punishment, or tends to support an alibi. However, nothing in this rule shall be construed to require the defendant to disclose information that would tend to incriminate that defendant;

(4) All investigative reports, except as provided in division (J) of this rule;

(5) Any written or recorded statement by a witness in the defendant's case-in-chief, or any witness that it reasonably anticipates calling as a witness in surrebuttal.

{¶ 32} Crim.R. 16(L) sets forth the trial court's role in regulating discovery between the parties. For the most part, the trial court maintains discretion to sanction discovery violations:

**(L) Regulation of Discovery.**

(1) The trial court may make orders regulating discovery not inconsistent with this rule. If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or with an order issued pursuant to this rule, the court may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances.

(2) The trial court specifically may regulate the time, place, and manner of a *pro se* defendant's access to any discoverable material not to exceed the scope of this rule.

(3) In cases in which the attorney-client relationship is terminated prior to trial for any reason, any material that is designated "counsel only", or limited in dissemination by protective order, must be

returned to the state. Any work product derived from said material

shall not be provided to the defendant.

{¶ 33} Counsel for Bugara was obligated to provide the text messages to the state pursuant to Crim.R. 16(H). "The overall objective of the criminal rules 'is to remove the element of gamesmanship from a trial.' " *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 19 quoting *City of Lakewood v. Papadelis*, 32 Ohio St.3d 1, 3, 511 N.E.2d 1138 (1987). "The purpose of the discovery rules 'is to prevent surprise and the secreting of evidence favorable to one party.' " *Id.* quoting *Lakewood,* 32 Ohio St.3d at 3, 511 N.E.2d 1138 (1987).

{¶ 34} According to the docket in this matter, Bugara requested discovery on July 3, 2017. The state responded to Bugara's request and requested reciprocal discovery on July 14, 2017. Bugara did not provide or mention any text messages to the state until late afternoon on February 22, 1018, the day before Preas' testimony. Further, at that time, counsel for Bugara provided just one text message to the state. During Preas' testimony, counsel attempted to question her about texts between herself and S.B. Questioned by the court upon the state's objection, counsel alleged he had just found out about the text messages the day before. Transcript of trial, February 22, 2018 (T. II) 151-158.

{¶ 35} Contrary to Bugara's argument, the trial court's ruling on the matter did not entirely prohibit testimony regarding the text messages. Instead, because counsel for appellant argued all he wanted to demonstrate that S.B was in contact with Preas at 3:59 a.m, the trial court permitted counsel to ask that question, but did not permit counsel to introduce the messages themselves. T. III, 156, 158. Preas answered affirmatively.

Appellant further argues introduction of the text messages was vital to impeaching S.B's credibility as she had denied texting Preas. However, counsel cross-examined S.B as follows:

> [Counsel for Bugara]: Ma'am, if Tanette has a text from you at 3:50 a.m. saying everything is ok, we made it back home; would you think Tanette would lie about a thing like that getting a text from you?
>
> [S.B]: No.

> T(II) 83.

{¶ 36} We find the trial court's remedy under these facts excluding the text messages falls within the boundaries of Crim.R 16(L), and further, that appellant was permitted to establish what he sought to establish. We therefore find no abuse of discretion.

{¶ 37} The first assignment of error is overruled.

II

{¶ 38} In his second assignment of error, Bugara argues his counsel rendered ineffective assistance by failing to provide the text messages between S.B and Preas to the state and further by failing to subpoena witnesses from Preas' cellular service provider to verify the messages. We disagree.

{¶ 39} To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e., that counsel's performance fell

below an objective standard of reasonable representation, and (2) that counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the result of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus. "Reasonable probability" is "probability sufficient to undermine confidence in the outcome." *Strickland* at 694, 104 S.Ct. 2052.

{¶ 40} While counsel for Bugara should have provided the text messages to the state in a timely fashion, and should have subpoenaed the appropriate witnesses to introduce such evidence, Bugara still fails to establish the second *Strickland* prong as he cannot demonstrate prejudice. In regard to the messages, counsel for appellant stated "Your Honor, all I want to try to establish is that [Preas] was in communication [with S.B] [up to] 3:59. That's it." T. III 156. Counsel was permitted to ask this question of Preas and Preas answered affirmatively. T. III 158.

{¶ 41} We therefore find Bugara suffered no prejudice and overrule the second assignment of error.

III

{¶ 42} Bugara's third assignment of error argues his conviction is against the manifest weight and sufficiency of the evidence. We disagree.

{¶ 43} On review for sufficiency, a reviewing court is to examine the evidence at trial to determine whether such evidence, if believed, would support a conviction. *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991). "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier

of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jenks* at paragraph two of the syllabus, following *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). See also, *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). The granting of a new trial "should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 44} Bugara went to trial charged with one count of sexual battery pursuant to R.C. 2907.03(A)(1) and/or (A)(2). These sections state:

> (A) No person shall engage in sexual conduct with another, not the spouse of the offender, when any of the following apply:
>
> (1) The offender knowingly coerces the other person to submit by any means that would prevent resistance by a person of ordinary resolution.
>
> (2) The offender knows that the other person's ability to appraise the nature of or control the other person's own conduct is substantially impaired.

{¶ 45} Sexual conduct is defined in R.C. 2907.01(A):

"Sexual conduct" means vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

{¶ 46} Bugara first argues the state failed to produce sufficient evidence to prove sexual conduct occurred.

{¶ 47} S.B testified she awoke due to pain in her backside. Before passing out again, she realized Bugara was behind her with his penis inserted in her anus. T(I) 53.

{¶ 48} Later that day, S.B saw a SANE nurse at Aultman Hospital who swabbed S.B's anal and perianal areas. Those swabs were sent to the BCI where it Y-STR testing determined that Bugara's DNA was consistent with the DNA isolated from the anal and perianal swabs. T(III)126-132. Additionally, sperm cells belonging to Bugara were found on the fitted sheet on S.B's bed. T(III) 121-123. We find this evidence was sufficient to prove sexual conduct occurred.

{¶ 49} Next, Bugara argues the state failed to produce sufficient evidence to prove S.B was substantially impaired.

{¶ 50} The trial court instructed the jury that "substantially impaired means a present reduction, diminution, or decrease in the victim's ability either to appraise the

nature of her conduct or control her conduct." T(IV) 21. S.B testified that she consumed mixed drinks and shots on the evening in question and eventually vomited outside the bar due to excessive consumption. T(II) 42-43, 45.She does not recall portions of the evening, but was aware she, Callahan, and Bugara walked to her apartment and that she fell once on the walk home. T(II) 47-48. She further recalled falling over as she attempted to get clothing for Callahan to sleep in, and then passing out on the floor. T(II) 52. Through Callahan's testimony, the state proved Bugara should have been aware of S.B's condition. Callahan testified that after S.B passed out on the floor, she and Bugara attempted to get her up and into bed. Being unsuccessful in the attempt, they left her where she fell. T(III) 57. We therefore find sufficient evidence to support a finding of substantial impairment.

{¶ 51} Last, Bugara points to inconsistencies in S.B's testimony vis-à-vis Callahan and Preas, and argues S.B should not have been believed by the jury due to these inconsistencies. The weight to be given to the evidence and the credibility of the witnesses however, are issues for the trier of fact. *State v. Jamison,* 49 Ohio St.3d 182, 552 N.E.2d 180 (1990). The jury was free to accept or reject any or all of the evidence offered by the parties and assess the witness's credibility. " 'While the jury may take note of the inconsistencies and resolve or discount them accordingly * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.' " *State v. Craig*, Franklin App. No. 99AP-739, 2000 WL 297252, (Mar. 23, 2000), quoting *State v. Nivens*, Franklin App. No. 95APA09-1236, 1996 WL 284714, (May 28, 1996). Indeed, the jurors need not believe all of a witness's testimony, but may accept only portions of it as true. *State v. Raver*, Franklin App. No. 02AP-604, 2003-Ohio-958, ¶

21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964); *State v. Burke*, Franklin App. No. 02AP-1238, 2003-Ohio-2889, citing *State v. Caldwell*, 79 Ohio App.3d 667, 607 N.E.2d 1096 (1992).

{¶ 52} Appellant points to inconsistencies in S.B's testimony with that of Callahan and Preas. None of these inconsistencies, however, pertain to the elements of sexual battery, but rather things that may or may not have occurred before the actual assault on S.B. There is no evidence in this record to indicate the jury lost its way in making its credibility determinations.

{¶ 53} We find the state produced sufficient evidence to support Bugara's conviction and further find the conviction is not against the manifest weight of the evidence.

{¶ 54} The final assignment of error is overruled.

{¶ 55} The judgment of the Court of Common Pleas, Stark County, Ohio is affirmed.

By Wise, Earle, J.

Wise, John, P. J. and

Gwin, J. concur.

EEW/rw