**The STATE of Ohio, Appellee,**

v.

**CALDWELL, Appellant.**

[Cite as *State v. Caldwell* (1992), 79 Ohio App.3d 667.]

Court of Appeals of Ohio,
Jackson County.

No. 648.

Decided April 28, 1992.

*Mark A. Ochsenbein,* Prosecuting Attorney, for appellee.

*Lorene G. Johnston* and *William S. Slavens,* for appellant.

STEPHENSON, Presiding Judge.

This is an appeal from a judgment of conviction entered by the Jackson County Court of Common Pleas, upon a jury verdict, finding Tony C. Caldwell, defendant below and appellant herein, guilty of murder in violation of R.C. 2903.02 and of having a weapon while under a disability in violation of R.C. 2923.13. Appellant assigns the following errors for our review:

"I. The prosecutor's remarks in closing arguments constituted prejudicial conduct sufficient to require reversal of defendant's conviction and deprived defendant of a fair and impartial trial.

"II. The state's failure to preserve evidence deprived defendant-appellant of his due process rights mandated by the 5th and 14th Amendments of the Constitution of the United States and Article I, Section 16 of the Ohio Constitution.

"III. The jury verdict of the trial court finding defendant-appellant guilty of murder and having a weapon while under a disability is contrary to law and to the Due Process Clause of the 14th Amendment of the Constitution of the

United States and Article I, Section 16 of the Ohio Constitution, in that there was insufficient evidence adduced to establish defendant-appellant's guilt beyond reasonable doubt.

"IV. The convictions of the trial court should be reversed because they are against the manifest weight of the evidence and because the evidence supporting them was insufficient as a matter of law to prove the conviction beyond a reasonable doubt."

The record reveals the following facts pertinent to this appeal. At the time of the events which transpired herein, appellant resided at a rooming house on West Second Street in Wellston, Ohio. Another apartment in that same rooming house was occupied by Rhonda Tiller and Rick Henry.

On the evening of November 13, 1987, Tiller and Henry were returning to their residence after an excursion "uptown." Upon his return, an inebriated Henry engaged young Steven Gregory (alternatively referred to throughout the record as "Tadpole" or "Tad") in conversation on the front porch of the residence. The discussion was soon interrupted by Joyce Reynolds, the boy's mother, who came out onto the porch and warned that "she didn't want no alcoholics around her son." This precipitated an altercation between them, during which appellant, Reynold's brother, also came out onto the porch, grabbed Henry and told him "not to be fighting with a woman * * * fight a man." Reynolds then turned to her brother and yelled for him to leave her and Henry alone because "it was her fight." Appellant acquiesced and went back upstairs to his room.

Shortly thereafter, Henry also proceeded to appellant's room in an attempt to continue their argument. Appellant advised him to leave several times, but Henry refused. Appellant then fired a "warning shot" with his shotgun in order to emphasize the instruction. Henry still refused to leave despite the "warning shot" and further urging by both Tiller and Reynolds. Finally, appellant stabbed Henry, who then allowed himself to be taken by Tiller back to their apartment.

Almost immediately, Henry left his room in order to return to the one occupied by appellant. He picked up a board which was lying outside appellant's room and then started inside. Appellant shot Henry, who then died several hours later.

On, or about, November 23, 1987, the grand jury for Jackson County indicted appellant on those charges previously set forth. The matter first came on for jury trial on May 1, 1988. After several days of testimony, the jury returned a verdict finding appellant guilty on both counts set forth in the indictment and on May 12, 1988, a judgment entry of conviction was filed thereon.

In *State v. Caldwell* (Dec. 29, 1989), Jackson App. No. 593, unreported, 1989 WL 159026, a majority of this court reversed that judgment on the grounds of prosecutorial misconduct and failure to give a jury instruction on voluntary manslaughter as a lesser included offense of murder.[1] The matter was thereafter remanded for a new trial which commenced on June 25, 1990. Once again, a verdict was returned finding appellant guilty on both counts set forth in the indictment. A judgment entry to that effect was filed on July 5, 1990, and this appeal followed.

Appellant's first assignment of error addresses several remarks made by the state in its closing argument which, he asserts, constitute a sufficient showing of prosecutorial misconduct to warrant a reversal of the judgment. For the following reasons, we disagree.

▮ Our attention is first directed to that portion of the state's argument wherein the prosecutor stated to the jury that "[t]here had to be some planning involved on the part of the defendant." Appellant argues that such a characterization is "unsubstantiated and highly inflammatory." We are not persuaded.

This remark was made by the prosecutor immediately following several comments that were made concerning the murder weapon. In essence, the state argued that the weapon was a "single-shot shotgun" which, by its very nature, required the ejection of a spent cartridge and reloading of a new one before it would be ready for reuse. Such activity, the state reasoned, would have required some "planning" on appellant's part that the confrontation between him and Henry would continue after the warning shot had been fired.

It is axiomatic that the prosecutor's conduct and remarks must be considered in light of the whole record. *State v. Durr* (1991), 58 Ohio St.3d 86, 94, 568 N.E.2d 674, 683; *State v. Maurer* (1984), 15 Ohio St.3d 239, 266, 15 OBR 379, 402, 473 N.E.2d 768, 792. Given the context of the state's argument concerning the nature of the murder weapon, we discern no error in its proposition that the reloading of the weapon would have required some planning.

---

1. In our previous decision, this writer declined to join the majority's determination that the prosecutorial misconduct amounted to reversible error. See *State v. Caldwell* (Dec. 29, 1989), Jackson App. No. 593, unreported, 1989 WL 159026 (Stephenson, J., concurring in part and dissenting in part). Moreover, while the majority also found the judgment therein to be against the manifest weight of the evidence, this writer further declined to join in that determination and, therefore, our judgment of reversal was not based on that issue. See Section 3(B)(3), Article IV, Ohio Constitution (no judgment resulting from a trial by jury shall be reversed on the weight of the evidence except by the concurrence of *all* three judges hearing the case).

Appellant would also direct our attention to several other remarks which, he contends, exhibit prosecutorial misconduct at the trial below. However, our review of the transcript does not reveal any objections having been made by appellant to these additional comments he would now question on appeal.[2] An appellate court will not, ordinarily, consider an assigned error which counsel could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court. *State v. Gordon* (1971), 28 Ohio St.2d 45, 57 O.O.2d 180, 276 N.E.2d 243, at paragraph two of the syllabus. Thus, any error with respect to improper comments made by a prosecuting attorney during final argument to a jury is waived if an objection is not made. See *Swift v. United States* (C.A.10, 1963), 314 F.2d 860, 863; *Heald v. United States* (C.A.10, 1949), 175 F.2d 878, 882–883. In our previous decision in this case, we were careful to warn appellant of the dangers of waiving this issue by not making an objection. See *Caldwell, supra* (Stephenson, J., concurring in part and dissenting in part).

Nevertheless, there was no objection entered with respect to those remaining comments cited by appellant and, therefore, any impropriety in their having been made to the jury is waived unless it can be determined that they constitute plain error under Crim.R. 52(B). See *United States v. Young* (1985), 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (applying Fed.R.Crim.P. 52[b] to instances where there was no timely objection to a prosecutor's comments). Notice of plain error under Ohio Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. *State v. Sneed* (1992), 63 Ohio St.3d 3, 10, 584 N.E.2d 1160, 1167; *State v. Greer* (1988), 39 Ohio St.3d 236, 246, 530 N.E.2d 382, 395; *State v. Long* (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, at paragraph three of the syllabus. The plain error test requires that, but for the existence of the error, the result of the trial would have been otherwise. *State v. Wiles* (1991), 59 Ohio St.3d 71, 86, 571 N.E.2d 97, 116. Despite this onerous burden, appellant argues that these remaining comments made by the prosecutor amount to plain error. We disagree.

First, appellant cites the aforementioned remarks characterizing the murder weapon as a "single-shot shotgun" and describing the process which one would have had to go through in order to reload it after firing the warning shot. Appellant contends that this was plain error because there was neither expert testimony, nor any other evidence, introduced to describe the mechanical operations of the shotgun. We find no merit in this contention.

---

2. The transcript reveals only that appellant objected to the state's use of the aforementioned "planning" argument.

The record clearly indicates that the shotgun itself was introduced as evidence below. The general mechanics necessary to operating that weapon would be evident to anyone examining it. Appellant cites no authority of law, and we are aware of none, which would require additional evidence to explain that which is readily apparent from an exhibit already submitted for the jury's consideration. To the contrary, counsel in closing argument may argue any evidence submitted in the case and all reasonable inferences or conclusions which may be drawn therefrom. *United States v. Werme* (C.A.3, 1991), 939 F.2d 108, 117; *United States v. Braithwaite* (C.A.11, 1983), 709 F.2d 1450, 1456. We are not persuaded that there was any error in urging the jury to infer the necessary mechanical steps to reloading a weapon which had already been submitted for their observation and consideration.

 Appellant also argues that the prosecutor committed plain error by stating that *"I believe* all the testimony shows that beyond a reasonable doubt Tony Caldwell purposely took the life of Ricky Henry." (Emphasis added.) Although appellant correctly argues that an advocate may not properly express his personal *belief* on the merits of a case, see, *e.g., United States v. Shaw* (C.A.5, 1983), 701 F.2d 367, 390, counsel may nevertheless express his contention as to the conclusion which a jury should draw from that evidence. *Id.;* see, also, *United States v. Mojica* (C.A.5, 1984), 746 F.2d 242, 245.

Admittedly, the prosecutor spoke the phrase "I believe" during his argument to the jury. However, the context in which those words were spoken clearly indicates that the state was merely urging the jury to draw a specific conclusion with respect to the evidence which had been presented below. The court in *United States v. Morris* (C.A.5, 1978), 568 F.2d 396, 402, drew the following distinction between the different usages for that phrase:

"Thus, an attorney properly may state, 'I believe that the evidence has shown the defendant's guilt,' * * * but he may not state, 'I believe that the defendant is guilty.' " (Citations omitted.)

We agree. While the prosecutor might have chosen better language to get his point across, a prosecutorial statement which, in retrospect, appears ill-advised or unfortunate is not necessarily constitutionally infirm. *United States v. Monaghan* (C.A.D.C.1984), 741 F.2d 1434, 1437. In short, we find no error with respect to that statement.

 Finally, appellant argues that it was plain error to allow two prosecutors, as a "tag team," to give the state's closing argument. The basis for this argument is that the court previously had restrained witness examinations and objections to one attorney from each side. In so ruling, the court held that it was not "exactly fair for two defense attorneys to gang up on a

prosecutor." Appellant now contends that it also was not "exactly fair" for two prosecutors to gang up on a defense attorney during closing argument. We find no merit in this argument.

To begin, the trial court is required to exercise a certain degree of control over the examination of witnesses. Evid.R. 611(A). However, the adversarial nature of a criminal trial has changed by the time it has reached the stage of closing argument, where counsel is no longer concerned about how to elicit certain desired testimony and the need to defend against evidentiary objections is reduced. We are not persuaded that "tag team" closing arguments are particularly egregious and, in any event, appellant cites no authority which would require a reversal on this issue. Having considered all alleged instances of prosecutorial misconduct and finding them to be without merit, we overrule the first assignment of error.

In his second assignment of error, appellant argues that he was denied his fundamental due process rights because the state failed to retain, and preserve, the victim's tee shirt for him to use as evidence in his defense at trial. The standard for resolving this argument was announced by the United States Supreme Court in *Arizona v. Youngblood* (1988), 488 U.S. 51, 57–58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281, 289, as follows:

"The Due Process Clause of the Fourteenth Amendment * * * makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant *material exculpatory evidence.* But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in [*California v.] Trombetta, supra* [(1984), 467 U.S. 479], at 486 [104 S.Ct. 2528, at 2533, 81 L.Ed.2d 413, at 421], that '[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed.' Part of it stems from our unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause, see *Lisenba v. California,* 314 U.S. 219, 62 S.Ct. 280, 289, 86 L.Ed. 166, 179] (1941), as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.,* those cases in which the police themselves by their conduct indicate that

the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve *potentially useful evidence* does not constitute a denial of due process of law." (Emphasis added.)

In *State v. Lewis* (1990), 70 Ohio App.3d 624, 634, 591 N.E.2d 854, 860–861, this court explained the holding in *Youngblood* as follows:

"The critical importance of *Youngblood* is that it differentiates, for purposes of due process analysis, between 'material exculpatory' evidence and 'potentially useful' evidence. Thus, if the prosecution suppresses, or fails to preserve, *material exculpatory* evidence, then a criminal defendant's due process rights have been violated. However, the suppression or failure to preserve *potentially useful* evidence violates constitutional due process only upon a showing of bad faith." (Emphasis *sic.*)

Accordingly, the first step in resolving this assignment of error is to determine whether the tee shirt sought by appellant was "material exculpatory evidence" or whether it was merely "potentially useful." Evidence is constitutionally "material" only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *State v. Johnston* (1988), 39 Ohio St.3d 48, 529 N.E.2d 898, at paragraph five of the syllabus; see, also, *United States v. Bagley* (1985), 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome. *Johnston, supra,* at paragraph five of the syllabus; *State v. Jackson* (1991), 57 Ohio St.3d 29, 33, 565 N.E.2d 549, 554.

In his brief, appellant argues that the tee shirt was "material exculpatory evidence" because of the bearing which it would have on the distance between himself and the murder victim at the time of the shooting. Expert testimony by Ronald W. Dye of the Ohio Bureau of Criminal Identification and Investigation approximated the distance between the gun muzzle and the victim as having been greater than four feet. Dye conceded, however, that his opinion did not account for any "intervening material" and, if Henry had worn a tee shirt, his opinion on the distance would change.

Larry M. Dehus, a self-employed forensic scientist, testified on behalf of appellant that, after certain tests which he had performed, he was of the opinion that the distance between the gun muzzle and the victim was twenty-four inches or less. Appellant now argues that if he had been provided access to the tee shirt, it would have changed Dye's opinion as to the distance. Thus, appellant concludes, he was denied the right to present a complete defense. We disagree.

To begin, it is not immediately apparent to us whether a change in Dye's opinion would have had a reasonable probability of affecting the outcome below. A unanimity of opinion concerning the distance between the parties at the time of the shooting may have lent additional credibility to appellant's claim of self-defense, but it would not have conclusively established that claim and it would not negate any of the elements of murder as set forth in R.C. 2903.02. Appellant's counsel effectively cross-examined the state's expert witness on the faulty premise of the absence of any intervening (tee shirt) material and then presented the testimony of Dehus that the distance between the shotgun muzzle and the point of impact on appellant's body was only two feet. This impeachment evidence notwithstanding, the jury still returned a guilty verdict.

Even if we were to assume that a change in Dye's opinion would have had a reasonable probability of affecting the jury verdict, the extent to which such a change of opinion would have occurred is mere conjecture. The transcript reveals the following testimony by Dye:

"Q. So if I were to tell you and ask you to assume what you already knew, and to further assume that at the time of the shooting the victim was wearing a t-shirt that was overhanging his trousers, would that change your opinion?

"A. Yes, it would.

"Q. And what would that do to your opinion? What would your new opinion be?

"A. I wouldn't be able to offer an opinion.

"Q. And why is that?

"A. Because there would have been an intervening material.

"Q. And therefore your opinion as to the distance would not stand either, would it?

"A. It could change, yes.

"Q. And in fact the weapon could be * * * the muzzle of the weapon could be much closer to the victim?

"A. Without that garment I can't make any determination as to what the distance would be.

"Q. Well, it could be two feet?

"A. Like I said I couldn't say.

"Q. Could be one hundred feet?

"A. It could be any distance.

" * * *

"Q. [On redirect examination.] I only have one question. If the victim was wearing a shirt, was the position of his shirt either inside, tucked inside his trousers, or outside his trousers?

"A. *If it was tucked on the inside of the trousers my conclusion would stand as is,* if it was on the outside of the trousers it could have an effect on the pattern." (Emphasis added.)

In short, the effect which access to the tee shirt would have had on the trial is, at best, speculative. The state's expert opinion would have changed *only* if the shirt had been left untucked outside the shirt at the time of the shooting. Even if that fact could be established, Dye was unclear as to the precise change which would occur in his opinion and specifically declined to join in the defense expert's opinion that the distance between the shotgun muzzle and the victim was less than two feet. Assuming, *arguendo,* that Dye would join in the defense opinion, we are still not persuaded that such a change would have had a reasonable probability of affecting the jury verdict. The mere possibility of that factor is not sufficient to undermine our confidence in the outcome below. Accordingly, we are not persuaded that the tee shirt could be classified as material exculpatory evidence.

Inasmuch as such evidence was only potentially useful, we now turn our consideration to whether there was any bad faith in failing to preserve it. See *Youngblood, supra,* 488 U.S. at 58, 109 S.Ct. at 337, 102 L.Ed.2d at 289. Appellant's only argument on this issue is in his reply brief, wherein he contends that the "[f]ailure to do very basic [police] work is bad faith." We disagree. Our review of the record yields a sufficient showing of police diligence. For these reasons, appellant's second assignment of error is overruled.

We shall jointly consider appellant's third and fourth assignments of error, as they both raise issues concerning the weight and sufficiency of evidence with respect to the murder conviction and the claim of self-defense.[3] The substance of appellant's argument is that, in light of the evidence that he had acted in self-defense, the state failed to prove the required *mens rea* to establish murder. While we agree that appellant advanced a strong case for self-defense, we do not reach the same conclusion.

---

**3.** The errors assigned by appellant also raise these issues with respect to his conviction for having a weapon while under a disability. However, appellant presents no separate argument on this conviction as required by App.R. 12(A). Thus, we need not specifically consider it. *State v. Newberry* (1991), 77 Ohio App.3d 818, 820, 603 N.E.2d 1086, 1088, fn. 1. However, in the interests of justice, we have reviewed the record and found sufficient evidence to support a conviction for violation of R.C. 2923.13.

■ A murder occurs when an individual "purposely" causes the death of another. See R.C. 2903.02. A person acts "purposely" when it is his "specific intention" to cause a certain result. R.C. 2901.22(A). The jury may presume an "intention" to kill where the natural and probable consequences of a defendant's action is to produce death and the jury may conclude, from all surrounding circumstances, that the defendant had an intention to kill. *State v. Edwards* (1985), 26 Ohio App.3d 199, 200, 26 OBR 420, 421, 499 N.E.2d 352, 353. During the trial, appellant testified that he intentionally pointed and fired the gun at Henry. Appellant also admitted to being aware that death could be a consequence of such action. This testimony was sufficient for the jury to infer an intention to kill and, therefore, find that the death had been "purposely" caused by appellant. Accordingly, the jury could properly find that the state had proven the requisite mental state to establish murder.

■ In reviewing a claim that a jury verdict was against the manifest weight of the evidence, or that the evidence was insufficient, an appellate court's duty is to review the record and determine whether there was sufficient evidence for the jury to find the defendant guilty beyond a reasonable doubt. *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523, at paragraph four of the syllabus. We are admonished that, in a review for sufficiency, we must construe the evidence in a light most favorable to the prosecution. *State v. Mills* (1992), 62 Ohio St.3d 357, 368, 582 N.E.2d 972, 983; *State v. Jenks* (1991), 61 Ohio St.3d 259, 574 N.E.2d 492, at paragraph two of the syllabus. Moreover, in determining whether the verdict was against the manifest weight of the evidence, we cannot reverse the conviction unless it is obvious that "the jury *clearly lost its way* and created such a *manifest miscarriage of justice* that the conviction must be reversed and a new trial ordered." (Emphasis added.) *State v. Davis* (1988), 49 Ohio App.3d 109, 113, 550 N.E.2d 966, 969. After carefully reviewing the evidence adduced in the cause *sub judice*, we hold that the jury verdict is supported by sufficient proof.

As previously mentioned, appellant admitted to intentionally pointing and firing the shotgun at the victim with knowledge that such action could cause his death. We also note testimony in the record by several different Wellston police officers to the effect that, soon after the incident, appellant expressed hope that the victim would die. This and other evidence in the record is sufficient to support a jury verdict finding that appellant had "purposely" caused Henry's death.

That brings us to the issue of self-defense. It is uncontroverted that appellant and the murder victim were the only two witnesses to those events which occurred in the final seconds before the shooting. Appellant testified

that the victim came into his room carrying a board and threatening to kill him. In that no evidence was adduced to rebut that testimony, appellant argues that self-defense was conclusively established and that the jury verdict of murder was against the weight of the evidence and was contrary to law. We disagree.

In order to establish a general claim of self-defense, the defendant must show (1) that he was not at fault in creating the situation giving rise to the affray, (2) that he had a *bona fide* belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of deadly force, and (3) that he did not violate any duty to retreat or avoid the danger. *State v. Williford* (1990), 49 Ohio St.3d 247, 249, 551 N.E.2d 1279, 1281; *State v. Robbins* (1979), 58 Ohio St.2d 74, 12 O.O.3d 84, 388 N.E.2d 755, at paragraph two of the syllabus. This standard is somewhat more relaxed in those instances where, as in the cause *sub judice*, the use of deadly force occurs in the defendant's home. Indeed, the law of Ohio is that there is no duty to retreat from one's own home. *Williford, supra,* at paragraph two of the syllabus.

Be that as it may, self-defense is still an affirmative defense in Ohio and the criminal defendant must demonstrate the appropriate elements of that defense by a preponderance of the evidence. *State v. Seliskar* (1973), 35 Ohio St.2d 95, 96, 64 O.O.2d 58, 59, 298 N.E.2d 582, 582; *State v. Poole* (1973), 33 Ohio St.2d 18, 19–20, 62 O.O.2d 340, 340–341, 294 N.E.2d 888, 889–890. If the defendant fails to prove any one of the pertinent elements of that defense, then he has failed to demonstrate that he acted in self-defense. *Williford, supra,* 49 Ohio St.3d at 249, 551 N.E.2d at 1281; *State v. Jackson* (1986), 22 Ohio St.3d 281, 283, 22 OBR 452, 454, 490 N.E.2d 893, 895. During the trial, appellant testified that Henry entered his room gripping a board, approached him and threatened to kill him. Appellant further testified that he believed his life was in danger. Our own review of the transcript confirms appellant's argument that this testimony was, indeed, uncontroverted.

However, the jury is free to believe all, part or none of the testimony of each witness who appears before it. *State v. Harriston* (1989), 63 Ohio App.3d 58, 63, 577 N.E.2d 1144, 1147; see, also, *In re Bowers* (Jan. 2, 1992), Athens App. No. 1490, unreported, at 10, 1992 WL 2870. It goes without saying that the jury below was in a much better position than this court to view the witnesses and observe their demeanor, gestures and voice inflections and to weigh their credibility. See *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 10 OBR 408, 410, 461 N.E.2d 1273, 1276. Thus, the weight of the evidence and witness credibility remain as issues for the trier of fact. *State v. Tyler* (1990), 50 Ohio St.3d 24, 32, 553 N.E.2d 576, 587; *State v.*

*DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212, at paragraph one of the syllabus. In reviewing the record before us, we note a number of items which could reasonably give a jury cause to doubt appellant's credibility.

Although appellant testified that he was in fear for his life when Henry came back to his room with the board, there was also testimony that appellant was noticeably larger in stature than his assailant and that the victim was, himself, intoxicated and "pretty messed up" on the evening of the murder. Furthermore, testimony by Paul Carter, a Jackson County Deputy Sheriff, indicated that the size of appellant's room/apartment was such that there was not even enough room inside for the victim to have swung the board at him. This evidence, by itself, would have been sufficient to render the credibility of appellant's testimony suspect.

However, even more damaging evidence was introduced with respect to certain comments made by appellant following the incident. For example, paramedic Charles Thomas Helm testified that when he arrived on the scene he overheard appellant ask, "What would you do if someone came into your home[?] * * * He came into my room I shot the son-of-a-bitch." Another account was given by patrolman Tim Ackley of the Wellston Police Department, who testified to appellant's remark that "[n]obody comes in my house running their mouth so I shot him." Similarly, patrolmen Nelson Schumacher, also of the Wellston Police Department, recounted appellant's statement that "[n]o little son-of-a-bitch is going to come into my house and start mouthing me." These examples are representative of a number of similar alleged statements for which evidence was introduced.

Taken together, this testimony casts doubt on appellant's contention that he was afraid for his life. If the jury found such testimony to be credible, then it could easily have concluded that appellant used deadly force in order to expel a belligerent and annoying intruder rather than to protect himself from death or great bodily injury. Whatever the law may be elsewhere, Ohio simply does not sanction the use of deadly force for that purpose. Indeed, while there is no duty to retreat from one's own home, there is also no privilege to use deadly force to eject a trespasser in the "absence of reasonable fear of death or great bodily injury." *State v. Catlin* (1990), 56 Ohio App.3d 75, 77–78, 564 N.E.2d 750, 754.

Thus, we hold that there was sufficient evidence adduced below to impeach the credibility of appellant's testimony regarding self-defense. The mere fact that such testimony was uncontroverted does not, *ipso facto*, require the jury to accept his argument if it is found by them to lack credibility. Moreover, we also hold that there was sufficient evidence to find that appellant had

purposely caused the victim's death. Accordingly, appellant's third and fourth assignments of error are overruled.

Having considered all errors assigned and argued by appellant, and finding the same to be without merit, we affirm the judgment of the trial court.

*Judgment affirmed.*

HARSHA, J., concurs.

GREY, J., dissents.

GREY, Judge, dissenting.

I respectfully dissent. I would sustain assignment of error three as it relates to the murder charge on the authority of *State v. Brown* (1988), 38 Ohio St.3d 305, 528 N.E.2d 523.