[Cite as *State v. Stone*, 2021-Ohio-2308.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                                 :

    Plaintiff-Appellee,               :

                                    No. 109338

    v.                                        :

JACOB J. STONE,                                :

    Defendant-Appellant.              :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 8, 2021

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-631296-C

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Brandon A. Piteo, Assistant Prosecuting Attorney, *for appellee.*

Kimberly K. Corral, *for appellant.*

MARY EILEEN KILBANE, J.:

{¶ 1} Defendant-appellant Jacob Stone ("Stone") appeals from his conviction and sentence for aggravated murder. For the reasons that follow, we affirm.

**Factual and Procedural History**

{¶ 2} On August 9, 2018, a Cuyahoga County Grand Jury indicted Stone and three codefendants on one count of aggravated murder in violation of R.C. 2903.01(A), one count of aggravated murder in violation of R.C. 2903.01(B), one count of kidnapping in violation of R.C. 2905.01(A)(3), one count of murder in violation of R.C. 2903.02(B), one count of felonious assault in violation of R.C. 2903.11(A)(1), and one count of felonious assault in violation of R.C. 2903.11(A)(2). On August 14, 2018, Stone pleaded not guilty to these charges.

{¶ 3} These charges resulted from the murder of Richard Hamel ("Hamel") that took place on June 30, 2018, in the backyard of a home in Cleveland, Ohio. Anthony Day ("Day"), Richard Cole ("Cole"), and Angel Wolfe ("Wolfe") were also charged with aggravated murder in connection with Hamel's death. Day and Cole both pleaded guilty to aggravated murder and kidnapping, and the court sentenced both to life in prison with the possibility of parole after 25 years. Wolfe pleaded guilty to involuntary manslaughter and kidnapping, and the court sentenced her to community control.

{¶ 4} This murder was the culmination of a baffling series of events between and among individuals who had, claimed to have, or wanted to have, connections with various motorcycle clubs. These individuals received instructions from Craig Stewart ("Stewart"), who was allegedly a member of Hells Angels in California, to "take out" Hamel. At the time that Hamel was murdered, none of the individuals involved had a motorcycle, and the record is unclear as to the extent to

which any of them were formally involved in any motorcycle gang, in Ohio or elsewhere.

{¶ 5}   On October 15, 2019, Stone waived his right to a jury trial, and a bench trial began. At trial, the state called one of the officers who responded to the scene and discovered Hamel's body, the medical examiner, Hamel's widow, Day, Wolfe, and Brenda DiNickle ("DiNickle"). The state also introduced a redacted video recording of Stone's statement to law enforcement after his arrest. The following summary of events was established by this evidence.

{¶ 6}   Day provided testimony as to how the sequence of events leading up to the June 30, 2018 murder. Day testified that he was the president of the Unholy One's Reapers motorcycle club in Conneaut, Ohio, and that his girlfriend, Wolfe, was also a member. Day also testified that in early 2018, Stewart contacted him and asked him to start a new chapter of the Hells Angels, a different motorcycle gang, in Ohio. According to Day, some members of Hells Angels in California had a problem with the Madison, Ohio chapter of the club, so Stewart was interested in starting a new chapter and shutting down the Madison chapter.

{¶ 7}   In connection with this effort to start a new Hells Angels chapter, Day testified that he had looked into Lyle Long ("Long") and Hamel as potential members of the new chapter. Around the time that Day was looking into Long and Hamel, he received a call from Stewart and subsequently was put in touch with Stone. Day testified that he and Stone spoke on the phone and discussed the fact that Hamel was "a false flagger" and "a snitch," and, based on that, Day understood

that Hamel would need to be "dealt with," which Day took to mean that Hamel would need to be killed.

{¶ 8} On June 30, 2018, using a borrowed PT cruiser, Day, Wolfe, and Wolfe's minor daughter drove from Conneaut to Mansfield to meet Stone. According to Day, they met Stone and Long at Long's house, and the five of them discussed killing Hamel. According to Day, the plan was to pick up Hamel, take him to Day's cousin's house in Cleveland, and stab him.

{¶ 9} In his statement, Stone detailed how he was in Missouri when a friend who had a motorcycle club there contacted him about starting a new club in Mansfield, Ohio. Stone took a bus from Missouri to Mansfield and got in touch with Long and several of Long's associates, including Hamel. In preparation for establishing a new club, Stone worked with Stewart to conduct background checks on Long and Hamel. Stewart told Stone that Hamel was trying to infiltrate rival motorcycle clubs, was selling fake motorcycle club paraphernalia, and was working as an informant with the police. Because of this, Stewart told Stone that "something's got to be done with [him]," and in response, Stone asked Stewart what he wanted done. Stone described the first meeting at Hamel's house, and said that Hamel had heard that Hells Angels was sending someone to "do something" to him, and accused Long of "putting a hit on him."

{¶ 10} Stone also stated that when he met up with Day, Stone told Day that they were getting threats from Stewart, who said that if they did not "take care of" Hamel, their lives and their families' lives would be at risk. Stone described going

to Hamel's house and said that Day told Hamel that they were going to look at a potential location for a new clubhouse in Cleveland. Stone said that he did not know exactly where they were going, he was suspicious of Day, and he knew the situation was not going to end well.

{¶ 11} Wolfe also testified at trial. She testified that she had met Day online in June 2018, and the two had seen each other every day for several weeks prior to Hamel's murder. In June 2018, Wolfe was living in Ashtabula, and she testified that Day had an idea to take Wolfe and her daughter on a road trip to Cleveland. Wolfe testified that on June 30, 2018, Day picked up Wolfe and her daughter in a white PT Cruiser. Wolfe testified that later that day, she learned that Day was interested in starting a motorcycle club and they had an understanding that she was going to be involved in the "women's group part" of the club. Wolfe testified that while she thought they were going to Cleveland, they actually drove to Mansfield.

{¶ 12} In her testimony, Wolfe claimed that she was largely ignorant of the situation, even as it was evolving. Whether Wolfe had a better understanding of the plan to murder Hamel than she claimed at trial, her testimony largely corroborates the events described by other witnesses. Wolfe described going to Long's house in Mansfield and meeting Stone and Cole, whom she thought were going to be sworn in as members the Unholy One's motorcycle club. Wolfe also testified that Stone told her he was a member of Hells Angels. With respect to the drive to Cleveland and the events that transpired there, Wolfe's testimony corroborated Day's testimony and Stone's statement.

{¶ 13} April Hamel ("April"), Hamel's widow, testified that she and Hamel moved to Mansfield, Ohio from Worcester, Massachusetts, between April and May 2018. She testified that she learned that Hamel was trying to join or form a motorcycle club after overhearing conversations he had with Day and Long. According to April, Hamel knew Day through mutual friends, but they had not actually met prior to these conversations. April also explained that Hamel had considered Long his adoptive father. April describes multiple visits made by Stone, Day, and Cole in the days leading up to June 30; this testimony largely mirrored other witness testimony.

{¶ 14} April testified that around 6 p.m. on June 30, 2018, shortly after Hamel returned home from selling a motorcycle she had bought for him, Stone, Cole, Day, and two women she did not know — Wolfe and Wolfe's minor daughter — arrived at her house in a white PT Cruiser. About 15 minutes after they arrived, Hamel went outside to speak with them. April testified that she was familiar with motorcycle clubs because when she was younger, her mother had asked a motorcycle club for protection from an abusive partner. Further, as an adult, April was personally involved with a motorcycle club in Wooster, Ohio. Over the objection of defense counsel, April testified regarding how Stone, Cole, and Day were dressed on June 30:

> PROSECUTOR: Now, these individuals that arrived at your house, Cole, Day, Stone, and 2 females, how were they dressed?
>
> APRIL: Anthony Day, Cole and Stone were dressed wearing biker vests and bandanas.

\* \* \*

PROSECUTOR: You have some familiarity with motorcycle clubs and/or gangs and cuts and bandanas; is that fair to say?

APRIL: Yes.

PROSECUTOR: What is the significance of wearing a bandana, wearing a cut?

APRIL: War, violence, death.

PROSECUTOR: Specifically what type of bandanas or cuts were they wearing?

APRIL: Stone and Cole were wearing red and white bandanas. Day was wearing a camouflaged green almost like an Army flag bandana.

PROSECUTOR: Do the colors red and white have any significance in motorcycle clubs?

APRIL: Yes.

PROSECUTOR: What significance?

APRIL: 81.

PROSECUTOR: What is 81?

APRIL: Hells Angels.

At the outset of this line of questioning, the court requested that the prosecutor lay a foundation for April's knowledge of these symbols. Beyond that, the court overruled defense counsel's repeated objections throughout this exchange.

{¶ 15} April went on to testify that Stone told Hamel that he wanted to talk and go for a drive, and Hamel left with the group in the PT Cruiser. About 30 minutes after they left, April was worried and sent Hamel a message on Facebook to

see if he was okay; he responded that he was okay, and this was the last time that April heard from Hamel. April continued to worry throughout that night, and around 2:30 a.m., she contacted law enforcement to report that Hamel was missing. The next day, April found Stone's Facebook page and sent him messages asking where Hamel was, but received no response.

{¶ 16} Other witness testimony describes the group arriving at Hamel's house around 5:30 p.m. on June 30, 2018, and Day told Hamel that they were going to make him a member of their motorcycle gang. According to Day, Hamel was excited, and they began the drive to Cleveland under the pretext that they needed to scout a possible location for a clubhouse. On the way, the group stopped at a rest stop and Cole took Hamel into the restroom and made him strip down to check whether he was wearing a wire or other listening device. According to Day, this upset Hamel, and the two men got into an argument in the rest-stop parking lot. Hamel accused Day of "put[ting] a contract" on him, and Day responded that if that were the case, Hamel "wouldn't be living."

{¶ 17} Upon arriving in Cleveland, the group went to one of DiNickle's two houses and waited for DiNickle to arrive. DiNickle testified that she had known Day her entire life because he was her stepmother's nephew and they considered each other cousins. Her testimony about the events of June 30, 2018, largely corroborated Day's testimony and Stone's statement to the police. She explained that Day told her he needed to speak with her, so they went into the bathroom of her house with Stone, Cole, and Wolfe. DiNickle testified that they had a conversation

about killing Hamel, but her initial response was to laugh because she did not believe that a murder was going to take place.  DiNickle testified that she was in a hurry to leave because she was going to her sister's house, so everyone left her house.

{¶ 18}  According to Day, he went into DiNickle's bathroom with DiNickle, Cole, Stone, and Hamel because, according to Day, that was where they were going to kill Hamel.  According to Stone, Day brought him into the bathroom and said "let's do him here."  After disagreement from DiNickle, the group decided to go to her other house.  According to Day and Stone, DiNickle directed them to her other house.  In his statement, Stone claimed that DiNickle gave them the address, and he stated that at this point, he believed they were going to look at a potential location for a new clubhouse.  According to DiNickle, she did not know where they were going.  Upon arriving at the other house, Day, Cole, and Stone discussed stabbing Hamel in the backyard.

{¶ 19}  Wolfe and her daughter stayed by the car at the front of the house while Stone, Day, Cole, and Hamel went into the backyard.  According to Wolfe, at this point, she still believed that they were going to swear the men into a motorcycle club.  She testified that she heard "scuffling" and at one point, she heard someone say "get him," but she did not go into the backyard or see what was happening.  Eventually, Stone, Day, and Cole came back to the front of the house without Hamel.  Wolfe testified that she asked where Hamel was and Stone told her not to worry about it, and said that he was "licking his wounds."  The group then got back into the car and drove to Ashtabula.  According to Wolfe's testimony, she did not notice

that any of the men were carrying weapons, but she noticed that Cole had a vest over his hands.

{¶ 20} According to Stone, he was still under the impression that they were looking at a clubhouse location, so when they arrived at DiNickle's second house, he began to inspect the house. He stated that he walked into the backyard, followed closely by Hamel, Cole, and Day. Stone stated that Cole rushed Hamel, knocked him to the ground, and Cole and Day began attacking him. While they were attacking Hamel, Stone walked back up the driveway towards the front of the house. According to Day, the group went into the backyard, Cole jumped on Hamel and tackled him, and then Day began stabbing Hamel in his gut. Day said that he stabbed Hamel three times and Cole stabbed Hamel numerous times, but Stone did not stab Hamel at all and instead walked back up the driveway toward the front of the house. Stone stated that he could hear Hamel gasping for air, and at one point, he heard Day say that Hamel was still breathing and Day told Cole to "finish" Hamel. Cole and Day came back to the car and were covered in blood. Cole gave his bloody knife to Stone, who used his handkerchief to wipe the blood off of the knife.

{¶ 21} According to DiNickle, she did not know that the group was going to her other house on Linnet Avenue, and she did not know why they would have gone there. DiNickle testified that she went to the Linnet Avenue house later that night to check her mail. When she got there, she saw that the side door that was usually kept locked was open, so she got out of the car to search the house and backyard.

Upon seeing Hamel's body in the backyard, she got back into her car, pulled out of the driveway, and called the cops.

{¶ 22} DiNickle stayed at the house and was there when police arrived that night. She testified that when they asked her if she could identify the body in the backyard, she lied and said that she could not. DiNickle also testified that when she was subsequently interviewed by the police about Hamel's murder, she lied and told them that she had never heard of Day. [1]

{¶ 23} Detective David Shapiro ("Detective Shapiro") testified that he responded to DiNickle's call in the early morning hours of July 1, 2018. He found Hamel's body and was able to identify him based on the identification Hamel had on his person. Upon notifying April of her husband's death, Detective Shapiro learned that Stone, Day, and Long may have had something to do with Hamel's murder.

{¶ 24} The next morning, upon reading an online article that a body had been discovered in DiNickle's backyard, Stone told Day that they needed to leave. Day claims that he was the one who decided to flee to California, and Stone claims that he made this decision. The group ultimately decided to drive west to see Stewart, so Wolfe began driving Stone, Day, and Cole west in the PT Cruiser. Wolfe testified that the men asked her to drive to California because of "something to do

---

[1] In connection with Hamel's murder, DiNickle was charged with obstructing justice and tampering with evidence. DiNickle pleaded no contest to the charges and was subsequently found guilty of both counts and sentenced to one year of community control on each count.

with a family member." She also testified that Stone told her not to use her cell phone, and he directed Day and Cole to remove the batteries and sim cards from their cell phones.

{¶ 25} Wolfe testified that the group ran out of money somewhere in Indiana and waited at a truck stop for a friend to transfer them money. Wolfe and Day both testified that Day threw his knife out of the car window somewhere in Nebraska. The group also stopped at a Nebraska pawn shop to sell Day's pocket watch and Stone's knife. Day testified that along the way, he spoke with Stewart over the phone and began to get nervous about Stone and Cole because there were "price tags put on our heads." Day said that he talked with Wolfe about separating from Stone and Cole because something did not seem right to him. Wolfe testified that the group ran out of money again in Kearney, Nebraska, and she started to get concerned about their plan. Wolfe called Long to ask for help, and eventually, Day and Wolfe deserted Stone and Cole at a library in Nebraska and began to drive back to Ohio. Cole and Stone, abandoned in Nebraska without transportation or funds, began to walk east towards Lincoln, Nebraska. Stone eventually left Cole in Lincoln, Nebraska. Wolfe testified that she asked Day what had happened to Hamel in the backyard, but she never got an answer. Upon arriving in Ashtabula, Day learned that there was a warrant for his arrest.

{¶ 26} Day eventually turned himself in and was interviewed by the police following his arrest, where he told police that Stone was the one who had killed

Hamel. At trial, Day explained that he lied to police because he did not want to go to prison, and that he and Cole had actually killed Hamel.

{¶ 27} Detective Shapiro subsequently learned that a woman (Wolfe) may have been involved in the murder, and that the group was traveling in a white PT Cruiser. Upon learning that Day and Wolfe had left Stone and Cole at a library in Kearney, Nebraska, Detective Shapiro reached out to the police in that jurisdiction and was able to obtain security footage from the library showing all four suspects.

{¶ 28} On July 19, 2018, Detective Shapiro learned that police in Phoenix, Arizona had arrested Cole. The same day, Wolfe contacted Detective Shapiro, and she was ultimately arrested and interviewed. Several days later, Stone was arrested by an FBI task force in Kentucky. Stone and Cole were both extradited to Ohio. On July 31, 2019, police interviewed Stone.

{¶ 29} Finally, the medical examiner testified that Hamel had 30 stab wounds on his neck and trunk and significant bruising on his face, and that the cause of Hamel's death were skeletal, visceral, and soft tissue injuries caused by 30 sharp-force wounds. Specifically, the wounds punctured one of Hamel's lungs, penetrated his spinal cord, and punctured his jugular, causing significant blood loss and paralysis. The medical expert testified that the manner of death was homicide.

{¶ 30} After hearing evidence and arguments, the trial court found Stone guilty of two counts of aggravated murder, one count of kidnapping, one count of murder, and two counts of felonious assault. All counts except the kidnapping merged for sentencing. On December 3, 2019, the court sentenced Stone to life with

the possibility of parole after 30 years on the aggravated murder count and 10 years on the kidnapping count, to be served concurrently.

{¶ 31} This appeal follows. Stone presents five assignments of error for our review.

**Assignments of Error**

> I. The trial court erred permitting and considering irrelevant and unfounded specialized gang opinion testimony over defense objection.
>
> II. Appellant was denied effective assistance of counsel where trial counsel failed to move for the exclusion of irrelevant and prejudicial evidence.
>
> III. Appellant's conviction was against the manifest weight of the evidence.
>
> IV. The state failed to present sufficient evidence to prove each and every element of the offense beyond a reasonable doubt.
>
> V. The trial court erred in sentencing appellant to a life term in prison with the possibility of parole after thirty years. [2]

**Legal Analysis**

**I. April Hamel's Testimony**

{¶ 32} In his first assignment of error, Stone argues that the trial court erred when it permitted and considered irrelevant and unfounded specialized gang opinion testimony over objection. Specifically, Stone argues that the trial court

---

[2] Although Stone's statement of his assignment of errors lists six separate assignments of error, his fourth assignment of error is listed twice. This opinion addresses the five assignments of error contained in the body of his brief.

erred in permitting April, a lay witness, to testify about motorcycle club imagery and symbolism.

{¶ 33} A trial judge has wide discretion when determining the admissibility of evidence, and evidentiary decisions will not be disturbed on appeal absent a clear showing of abuse of discretion. *State v. Heineman*, 2016-Ohio-3058, 65 N.E.3d 287, ¶ 15 (8th Dist.), citing *Renfro v. Black*, 52 Ohio St.3d 27, 32, 556 N.E.2d 150 (1990). An abuse of discretion is more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). Additionally, we note that in a bench trial, "there is a presumption that the trial court considered only evidence that was reliable, relevant, and competent in rendering its decision unless it affirmatively appears to the contrary." *Rose of Sharon Fence Supply, Ltd. v. Davis*, 8th Dist. Cuyahoga No. 102804, 2016-Ohio-924, ¶ 28, citing *Sonis v. Rasner*, 2015-Ohio-3028, 39 N.E.3d 871, ¶ 70 (8th Dist.), citing *State v. Pleban*, 9th Dist. Lorain No. 10CA009789, 2011-Ohio-3254, ¶ 45.

{¶ 34} Pursuant to Evid.R. 701, opinion testimony by lay witnesses "is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue." Lay person opinion testimony "results from a process of reasoning familiar in everyday life, while expert opinion testimony results from a process of reasoning that only specialists in the field can master." *State v. Johnson*, 7th Dist. Jefferson No. 13 JE 5, 2014-Ohio-1226, ¶ 56,

citing *State v. Russell*, 12th Dist. Butler No. CA2012-08-156, 2013-Ohio-3079, ¶ 36, quoting *State v. Lewis*, 192 Ohio App.3d 153, 2011-Ohio-187, 948 N.E.2d 487, ¶ 23 (5th Dist.).

{¶ 35} Stone argues that April provided specialized testimony as to the imagery, symbolism, significance, and history of various motorcycle clubs. We disagree. April testified as to her understanding of her husband's involvement with Stone and his codefendants. April understood that her husband had discussed starting a new motorcycle club with Day and Long. Based on her understanding of the interactions leading up to Hamel's murder, together with her personal experience with various aspects of motorcycle club symbolism, April testified that she understood that certain colors and numbers were connected to Hells Angels. She further testified that she associated motorcycle club bandanas, or cuts, with "war, violence, and death." This testimony was not based on a specialized reasoning process unique to an expert witness. Rather, the testimony was based on April's own personal experience, her own personal history, and her perception of the events leading to her husband's murder. The trial court's decision to allow this testimony was within the wide range of its discretion and was not unreasonable, arbitrary, or unconscionable.

{¶ 36} Further, even if we could conclude that the trial court abused its discretion in permitting April to testify as to the significance of various motorcycle gang symbols, any error in permitting this testimony was harmless. Crim.R. 52(A) provides that "[a]ny error, defect, irregularity, or variance which does not affect

substantial rights shall be disregarded." The term "substantial rights" requires that the error was prejudicial. *State v. Sanchez*, 11th Dist. Ashtabula No. 2018-A-0097, 2020-Ohio-5470, ¶ 97, citing *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153, ¶ 23. None of the aforementioned testimony from April prejudiced Stone. To the extent that her testimony established a link between Stone and a violent motorcycle gang, such a link was likewise established by other witness testimony and Stone's own statement. Further, to the extent that April's testimony implied that Stone was involved with "violence" or "death," the balance of the evidence in this case established that by making clear that Stone was involved in a brutal murder. Therefore, we overrule Stone's first assignment of error.

## II. Ineffective Assistance of Counsel

{¶ 37} In his second assignment of error, Stone argues that he received ineffective assistance of counsel when his trial counsel failed to move for the exclusion of irrelevant and prejudicial evidence. Stone asserts that his trial counsel should have challenged or attempted to exclude testimony from Daniel Mabel ("Mabel"), a forensic scientist in the trace evidence department of the Cuyahoga County Medical Examiner's office. Specifically, Stone's challenge revolves around Mabel's testimony regarding the trace metal detection test that he performed.

{¶ 38} To succeed on an ineffective assistance of counsel claim, the appellant must show that his trial counsel's performance was deficient and that the deficient performance prejudiced his defense. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland v. Washington*, 466 U.S. 668,

104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Prejudice is established when the defendant demonstrates "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland* at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.*

{¶ 39} Mabel testified that he performed a trace metal detection test by spraying Hamel's hands to determine whether he may have been holding a metal object. Mabel described the utility of trace metal detection tests generally as follows:

> The spray, if somebody was holding a metal object, sometimes will react and cause like a visible strike that will indicate a reaction with metal. However, the test is most often negative. When it's negative, it doesn't really mean much. There is not a whole lot of value to a negative result. The value in this test is in a positive result. So if I see – if I actually see a reaction, I can say something about this person may have been holding a metal object. If I don't see a reaction, it doesn't mean a whole lot.

Mabel went on to testify that there was no reaction based on the test in this case.

{¶ 40} Stone argues that because this testimony was irrelevant, it had no evidentiary value and should not have been permitted into evidence. He asserts that his trial counsel was ineffective for failing to challenge the evidence prior to trial or move for the exclusion of the evidence pursuant to Evid.R. 401 and 402 during trial. We disagree.

{¶ 41} As an initial matter, we note that Stone mischaracterizes the evidence in question as irrelevant. Evid.R. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the

determination of the action more probable or less probable than it would be without the evidence." Here, although the testimony regarding the trace metal detection test had limited probative value, we disagree that it completely lacked relevance. Although Mabel's testimony may not have directly proven or disproven an essential element of any of the offenses in this case, it nevertheless provided the court with a more complete understanding of the investigation and analysis of trace evidence that occurred in this case.

{¶ 42} More importantly, Stone's argument in support of this assignment of error contains no argument that he was prejudiced by the admission of Mabel's testimony. To succeed on a claim of ineffective assistance of counsel, Stone must satisfy both elements of the *Strickland* test. *Id*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674. In the absence of any explanation for how the outcome of the proceeding might have been different had trial counsel moved for the exclusion of this evidence, let alone how that might have amounted to prejudice, Stone is unable to establish that he received ineffective assistance of counsel. Therefore, we overrule Stone's second assignment of error.

## III. Manifest Weight

{¶ 43} In his third assignment of error, Stone argues that his conviction was against the manifest weight of the evidence. Specifically, he asserts that the only evidence that he was involved in the planning of Hamel's murder came from Day, whose testimony was not credible and was directly contradicted by the testimony of other witnesses. Stone argues that Day admitted that he lied, his testimony was

contradicted by that of other witnesses, he was a convicted sex offender, and Day had received a plea deal in this case prior to testifying against Stone at trial. Stone also argues that there is no credible evidence of his specific intent to cause Hamel's death, as required for an aggravated murder conviction. In light of these problems with Day's credibility, Stone argues that his conviction was against the manifest weight of the evidence.

{¶ 44} A manifest weight challenge attacks the quality of the evidence and questions whether the state met its burden of persuasion at trial. *State v. Hill*, 8th Dist. Cuyahoga No. 99819, 2014-Ohio-387, ¶ 25, citing *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. When reviewing a manifest weight challenge, a court reviews the entire record, weighing all evidence and reasonable inferences and considering the credibility of the witnesses, to determine whether the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶ 45} Although we consider credibility when reviewing a manifest weight challenge, "issues relating to the credibility of witnesses and the weight to be given are primarily for the trier of fact." *State v. Matthews*, 8th Dist. Cuyahoga No. 97916, 2012-Ohio-5174, ¶ 34, citing *State v. Thomas*, 70 Ohio St.2d 79, 80, 434 N.E.2d 1356 (1982), and *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. Further, the trier of fact is free to believe all, part, or none of the testimony of each witness. *Id.* citing *State v. Caldwell*, 79 Ohio App.3d 667, 607

N.E.2d 1096 (4th Dist.1992). Therefore, appellate courts will generally defer conflicts in the evidence to the trier of fact who had the opportunity to hear witnesses and observe their demeanor. *Id.* citing *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986).

{¶ 46} "Criminal intent 'can be inferred from the presence, companionship, and conduct of the defendant before and after the offense is committed.'" *State v. Shabazz*, 8th Dist. Cuyahoga No. 100021, 2014-Ohio-1828, ¶ 24, quoting *In re T.K.*, 109 Ohio St.3d 512, 2006-Ohio-3056, 849 N.E.2d 286, ¶ 13, citing *State v. Johnson*, 93 Ohio St.3d 240, 754 N.E.2d 796, syllabus. Further, the Ohio Supreme Court has observed that an individual's "extensive efforts to avoid detection" following a murder may be used to infer the individual's specific intent. *State v. Coleman*, 37 Ohio St.3d 286, 291, 525 N.E.2d 792 (1988), citing *State v. Austin*, 52 Ohio App.2d 59, 68, 368 N.E.2d 59 (10th Dist.1976).

{¶ 47} Having reviewed the entire record, including the trial transcript and Stone's recorded statement to the police, we cannot conclude that this is the exceptional case in which the trial court lost its way and created a manifest miscarriage of justice.

{¶ 48} Stone argues that the only evidence that he was involved in planning Hamel's murder came from Day, and is therefore unreliable. We disagree. All of the evidence, including Stone's own statement, clearly establishes that he went with his codefendants to the house where Hamel was ultimately murdered with Hamel and the codefendants, that he left the murder scene with them following Hamel's

murder, and that he fled the state with them the next day. Stone's statement and Day's testimony largely mirror each other. Both described getting instructions from Stewart as to how to handle the situation involving Hamel. Both described multiple group conversations about this as well, and this was corroborated by other witness testimony. Further, Stone described contacting Day and telling him to come to Mansfield. This and other aspects of Stone's statement imply that Stone was the one orchestrating the events leading up to Hamel's death; curiously, the only aspect of Stone's narrative in which he does not appear to be in control is the actual murder. Additionally, Stone's statement makes it clear that he specifically sought out Hamel prior to his murder. He stated that upon arriving in Mansfield, he asked Long and Cole where Hamel was located and visited Hamel multiple times before he eventually left for Cleveland with the group.

{¶ 49} Stone also argues that he did not know that the plan was to murder Hamel. This assertion is undermined by the majority of the evidence in the record including his own statements, his own actions, and the statements of other witnesses. The main difference between Stone's statement and the other evidence in the record is that Stone maintained that he thought that Hamel would just need to be "roughed up," and not murdered. Day, DiNickle, and Wolfe all described having conversations about killing Hamel, and Stone was present for those conversations. Stone did not deny that he had conversations with the group about Hamel. Further, the evidence in the record, including Stone's statement, establishes that even Hamel suspected that his life was at risk. On the way to Cleveland from

Mansfield, Hamel confronted the group about "putting a hit" on him. While Stone denied this and denied that he would do something to Hamel, he told Hamel that "if it gets ordered down, somebody else is going to do something to you." In addition, Stone made repeated references to threats from Stewart if they did not "take care of" Hamel; Stone told Day that they needed to "carry this out, or else it's our lives [at] stake." Stone also admitted that he knew that the situation would not end well when they picked up Hamel from his house in Mansfield.

{¶ 50} Furthermore, while the evidence is clear that Stone did not physically stab Hamel, Stone's actions during and after Hamel's murder support his convictions. Despite claiming that he believed that the men were just beating Hamel and not stabbing him, Stone also stated that he heard Hamel gasping for air and heard Day tell Cole to "finish" Hamel. Stone also told Wolfe and her daughter to go back to the car and made sure that the group could leave the scene as soon as Day and Cole came back from the backyard. Finally, Stone decided that the group should flee to California after learning that Hamel's body was discovered. All of this contradicts Stone's argument on appeal that he did not know that Hamel would be killed and that he was, at most, engaged in evidence tampering and obstruction of justice following the murder.

{¶ 51} After reviewing the evidence in this case, we conclude that this is not the exceptional case in which the trier of fact clearly lost its way. Stone's convictions are not against the manifest weight of the evidence. Therefore, his third assignment of error is overruled.

## IV. Sufficiency of the Evidence

{¶ 52} In Stone's fourth assignment of error, he argues that the state failed to present sufficient evidence to support his convictions. Unlike a manifest weight challenge, the test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, at ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541.

{¶ 53} Stone's argument in support of this assignment of error is largely identical to his argument that his convictions were against the manifest weight of the evidence. He argues that because it was undisputed that he did not stab Hamel and the only evidence that he engaged in any planning of Hamel's murder came from Day, there was not sufficient credible evidence to support his convictions. Stone also points to R.C. 2923.01(H)(1), which provides that "no person shall be convicted of conspiracy upon the testimony of a person with whom the defendant conspired, unsupported by other evidence." Therefore, Stone argues that Day's testimony alone could not legally support his conviction because Day was a co-conspirator. We disagree.

{¶ 54} We reiterate that Day's testimony, notwithstanding Stone's arguments that he lacked credibility, was largely corroborated by other evidence in the record, including Stone's own statement to police. Because Day's testimony was

not the sole basis for Stone's convictions, R.C. 2923.01(H)(1) is inapplicable here. Further, the state presented evidence that Stone was present for, and in many ways orchestrated, the events leading to Hamel's murder. The state also presented that Stone coordinated the group's ill-considered attempt to flee after learning that Hamel's body was discovered. Viewing the evidence in the light most favorable to the state, any rational trier of fact could have found Stone guilty of the essential elements of his crimes beyond a reasonable doubt. Therefore, Stone's fourth assignment of error is overruled.

**V. Sentence**

{¶ 55} In Stone's fifth and final assignment of error, he argues that the trial court erred in sentencing him to life in prison without the possibility of parole. Specifically, Stone argues that his sentence was not supported by clear and convincing evidence and that the trial court erred by sentencing him to a harsher sentence than Day and Cole despite Stone's argument that he was significantly less culpable than his codefendants.

{¶ 56} Stone argues that this court reviews felony sentences pursuant to R.C. 2953.08(G)(2). Generally, pursuant to R.C. 2953.08(G)(2), an appellate court "may increase, reduce, or otherwise modify a sentence" if it clearly and convincingly finds that either the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, or that the sentence is otherwise contrary to law. *State v. Gwynne*, 158 Ohio St.3d 279, 2019-Ohio-4761,

141 N.E.3d 169, ¶ 16. However, R.C. 2953.08(D)(3) provides that "[a] sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review."

{¶ 57} The Ohio Supreme Court has held that R.C. 2953.08(D) is unambiguous and "clearly means what it says: such a sentence cannot be reviewed." *State v. Porterfield*, 106 Ohio St.3d 5, 2005-Ohio-3095, 829 N.E.2d 690, ¶ 17. Because Stone's sentence was imposed for his conviction for aggravated murder, in violation of R.C. 2903.01(A), it is not subject to appellate review under R.C. 2953.08. Stone's fifth assignment of error is overruled.

{¶ 58} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

MARY J. BOYLE, A.J., and
EILEEN T. GALLAGHER, J., CONCUR